LOAN AGREEMENT

BY AND BETWEEN

BOUCHARD TRANSPORTATION CO., INC., on the one hand

and

WELLS FARGO BANK, NATIONAL ASSOCIATION, on the other hand

$100,000,000 Revolving Credit Facility

_____

dated as of October 30, 2013

_____

EXHIBIT 1

## TABLE OF CONTENTS

PAGE

Article 1. Definitions ...........................................................................................................1
    Section 1.1        Certain Definitions..........................................................................1
    Section 1.2        Accounting Terms.........................................................................15
    Section 1.3        Certain Interpretations. ................................................................15

Article 2. Loans; Collateral..............................................................................................15
    Section 2.1        Loans............................................................................................15
    Section 2.2        Notices Relating to Loans.............................................................16
    Section 2.3        Disbursement of Loan Proceeds....................................................17
    Section 2.4        Note..............................................................................................17
    Section 2.5        Repayment of Principal of Loans. ................................................17
    Section 2.6        Mandatory and Voluntary Prepayments. ......................................18
    Section 2.7        Interest..........................................................................................19
    Section 2.8        Commitment Fee............................................................................20
    Section 2.9        Computations.................................................................................20
    Section 2.10      Minimum Amounts of Conversions, Prepayments and Interest
                     Periods..........................................................................................20
    Section 2.11      Lending Offices.............................................................................21
    Section 2.12      Time and Method of Payments......................................................21
    Section 2.13      Use of Proceeds of Loans. ............................................................21
    Section 2.14      Guaranties. ...................................................................................21
    Section 2.15      Security. .......................................................................................21
    Section 2.16      Conversions of Loans. ..................................................................22
    Section 2.17      Additional Costs: Capital Requirements.......................................23
    Section 2.18      Limitation on Types of Loans. ......................................................24
    Section 2.19      Illegality. .....................................................................................24
    Section 2.20      Certain Conversions pursuant to Sections 2.17 and 2.19............25
    Section 2.21      Indemnification.............................................................................25
    Section 2.22      Telephonic Notices. ......................................................................26

Article 3. Representations and Warranties........................................................................26
    Section 3.1        Organization..................................................................................26
    Section 3.2        Power, Authority, Consents. .........................................................27
    Section 3.3        No Violation of Law or Agreements. ...........................................27
    Section 3.4        Due Execution, Validity, Enforceability.......................................28
    Section 3.5        Properties, Priority of Liens; Vessel Classification,
                     Documentation, Insurance, etc......................................................28
    Section 3.6        Judgments, Actions, Proceedings. ................................................29
    Section 3.7        No Defaults, Compliance With Laws. ..........................................29
    Section 3.8        Burdensome Documents. ..............................................................30
    Section 3.9        Solvency.......................................................................................30
    Section 3.10      Tax Returns. .................................................................................30
    Section 3.11      Intangible Assets...........................................................................30

TABLE OF CONTENTS (con't.)

Section 3.12        Regulation U. ...................................................................................31
Section 3.13        Name Changes, Mergers, Acquisitions: Location of Collateral. ..............31
Section 3.14        Full Disclosure. .................................................................................31
Section 3.15        Licenses and Approvals. .....................................................................31
Section 3.16        Labor Disputes; Collective Bargaining Agreements: Employee
                    Grievances. .......................................................................................31
Section 3.17        Condition of Assets. ...........................................................................32
Section 3.18        ERISA. ..............................................................................................32
Section 3.19        Financial Statements. ..........................................................................32
Section 3.20        Compliance with OFAC Rules and Regulations. ....................................32
Section 3.21        Anti-Terrorism Laws. .........................................................................33
Section 3.22        Compliance with FCPA. ......................................................................33
Section 3.23        Investment Company Act, Etc. .............................................................33
Section 3.24        Vessel Qualification. ..........................................................................34

Article 4. The Closing: Conditions to the Loan ...............................................................34
Section 4.1         The Closing. ......................................................................................34
Section 4.2         Conditions to the Initial Loan. .............................................................34
Section 4.3         Conditions to Each Loan. ....................................................................37

Article 5. Delivery of Financial Reports, Documents and Other Information .......................37
Section 5.1         Annual Financial Statements. ...............................................................37
Section 5.2         Quarterly Financial Statements. ...........................................................38
Section 5.3         Compliance Information. .....................................................................38
Section 5.4         Certificate of Accountants. ..................................................................38
Section 5.5         Accountants' Reports. .........................................................................38
Section 5.6         Notices of Defaults. ............................................................................39
Section 5.7         ERISA Notices and Requests. ..............................................................39
Section 5.8         Additional Information. .......................................................................39

Article 6. Affirmative Covenants. ...................................................................................39
Section 6.1         Books and Records. ............................................................................39
Section 6.2         Inspections and Audits. .......................................................................39
Section 6.3         Compliance with Laws: Maintenance and Repairs. ................................40
Section 6.4         Continuance of Business. .....................................................................40
Section 6.5         Copies of Corporate Documents. ..........................................................40
Section 6.6         Perform Obligations. ..........................................................................40
Section 6.7         Notice of Litigation. ...........................................................................40
Section 6.8         Insurance. ..........................................................................................41
Section 6.9         Financial Covenants. ..........................................................................42
Section 6.10        Notice of Certain Events. ....................................................................42
Section 6.11        ERISA Compliance. ...........................................................................43
Section 6.12        Environmental Compliance. .................................................................43
Section 6.13        Certain Affirmative Covenants Relating to the Vessels. ..........................43
Section 6.14        Reserved. ..........................................................................................44
Section 6.15        Approved Additional Financing ...........................................................44

TABLE OF CONTENTS (con't.)

Section 6.16      Appraisal Value. ................................................................44

Article 7. Negative Covenants. ................................................................44
Section 7.1       Indebtedness. ...............................................................45
Section 7.2       Liens. ...........................................................................45
Section 7.3       Guaranties. ...................................................................47
Section 7.4       Mergers, Acquisitions. .................................................47
Section 7.5       Reserved. ......................................................................47
Section 7.6       Stock Issuance. ............................................................47
Section 7.7       Change in Business. .....................................................47
Section 7.8       Prepayments. ................................................................48
Section 7.9       Investments. ..................................................................48
Section 7.10      Fiscal Year. ...................................................................49
Section 7.11      ERISA Obligations. ......................................................49
Section 7.12      Amendments of Documents. .........................................50
Section 7.13      Reserved. ......................................................................50
Section 7.14      Reserved. ......................................................................50
Section 7.15      Use of Cash. .................................................................50
Section 7.16      Hedging Transactions. ..................................................50
Section 7.17      Transactions with Affiliates. .........................................50
Section 7.18      Hazardous Material. ......................................................51
Section 7.19      Certain Negative Covenants Relating to the Vessels. .................51

Article 8. Events of Default ................................................................51
Section 8.1       Payments. ......................................................................51
Section 8.2       Certain Covenants. .......................................................51
Section 8.3       Other Covenants. ..........................................................52
Section 8.4       Other Defaults. .............................................................52
Section 8.5       Representations and Warranties. ...................................52
Section 8.6       Bankruptcy. ...................................................................53
Section 8.7       Judgments. ....................................................................53
Section 8.8       ERISA. ..........................................................................53
Section 8.9       Ownership of Stock. .....................................................54
Section 8.10      Management. ..................................................................54
Section 8.11      Liens. .............................................................................54
Section 8.12      The Vessels. ..................................................................54

Article 9. Miscellaneous Provisions ........................................................55
Section 9.1       Fees and Expenses; Indemnity. ....................................55
Section 9.2       Taxes. ............................................................................56
Section 9.3       Payments. ......................................................................56
Section 9.4       Survival of Agreements and Representations; Construction. ..................57
Section 9.5       Lien on and Set-off of Deposits. ..................................57
Section 9.6       Modifications, Consents and Waivers; Entire Agreement. ........................57
Section 9.7       Remedies Cumulative; Counterclaims. .........................58
Section 9.8       Further Assurances. ......................................................58

TABLE OF CONTENTS (con't.)

| | | |
|---|---|---|
| Section 9.9 | Notices. | 58 |
| Section 9.10 | Counterparts, | 59 |
| Section 9.11 | Severability. | 59 |
| Section 9.12 | Binding Effect; No Assignment or Delegation by Borrower | 60 |
| Section 9.13 | GOVERNING LAW; CONSENT TO JURISDICTION: WAIVER OF TRIAL BY JURY. | 60 |
| Section 9.14 | Assignments and Participations by the Bank. | 61 |
| Section 9.15 | Patriot Act Notice. | 62 |
| Section 9.16 | Confidentiality. | 62 |

TABLE OF CONTENTS (con't.)

Exhibits

    A       Form of Note
    B       Form of Compliance Certificate
    C       Form of Guaranty
    D       Form of Solvency Certificate


Schedules

    3.1     States of Incorporation and Qualification, and Capitalization and Ownership of Stock, of Borrower and Guarantors
    3.2     Consents, Waivers, Approvals; Violation of Agreements
    3.5     Vessels
    3.8     Burdensome Documents
    3.11    Patents, Trademarks, Trade Names, Services Marks, Copyrights
    3.13    Name Changes, Mergers, Acquisitions, Location of Collateral
    3.16    Labor Disputes; Collective Bargaining Agreements; Employee Grievances 3.18 Employee Benefit Plans
    4.2     Consents, Approvals and Waivers
    7.1     Permitted Indebtedness and Guaranties
    7.2     Permitted Security Interests, Liens and Encumbrances

LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement"), made as of the 30th day of October, 2013, by and between BOUCHARD TRANSPORTATION CO., INC., a New York corporation (the "Borrower"), on the one hand, and WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association (the "Bank") on the other hand.

W I T N E S S E T H :

WHEREAS, the Borrower and certain Subsidiaries operate vessels in the coastwise trade under common or affiliated management;

WHEREAS, the Borrower from time to time may provide working capital and other financial assistance to such Subsidiaries;

WHEREAS, such Subsidiaries will derive benefits, directly and indirectly, from the loans to be made to the Borrower pursuant to this Agreement; and

WHEREAS, the Bank is willing to make senior secured revolving credit loans to the Borrower in an aggregate principal amount not to exceed $100,000,000 at any time outstanding on the terms and conditions hereinafter set forth,

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree as follows:

Article 1.
Definitions

Section 1.1    Certain Definitions.

As used in this Agreement, the following terms shall have the following meanings:

"Additional Security" has the meaning ascribed thereto in Section 6.16.

"Affected Loans" has the meaning ascribed thereto in Section 2.20.

"Affected Type" has the meaning ascribed thereto in Section 2.20.

"Affiliate" means, as to any Person, any other Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise), provided that, in any event: (a) any Person that owns directly or indirectly 5% or more of the securities having ordinary voting power for the election of directors or other governing body of a corporation or 10% or more of the partnership or other ownership interests of any other Person (other than as a limited partner

of such other Person) will be deemed to control such corporation or other Person; and (b) each shareholder, director and officer of any Borrower shall be deemed to be an Affiliate of such Borrower.

"Agreement" has the meaning ascribed thereto in the preamble hereto.

"Applicable Lending Office" means, with respect to each type of Loan, the office of the Bank or of an affiliate of the Bank as the Bank may from time to time specify to the Borrower as the office at which its Loans of such type are to be made and maintained.

"Applicable Margin" means, (a) with respect to any Eurodollar Loan, one and three-eighths percent (1.375%) and (b) with respect to any Prime Rate Loan, zero percent (0.00%).

"Appraisal Value" means, in respect of any Vessel, the fair market value of such Vessel, as determined from time to time in accordance with this Agreement by an independent sale and purchase broker selected by the Bank, taking into account such Vessel's physical condition, type and flag, among other relevant considerations, to determine the price that would be obtained in an arm's-length transaction between an informed and willing buyer-user (other than a person currently in possession) and an informed and willing seller under no compulsion to sell and, in such determination, costs of removal from the location of current use shall be a deduction from such value.

"Approved Additional Financing" means any one or more of the following; provided, that the aggregate principal amount of all Approved Additional Financings for the items set forth in clauses (a), (b), (c) and (d) below shall not exceed Twenty Million Dollars ($20,000,000):

(a)     unsecured loans to Borrower by banks or financing institutions other than the Bank, provided that the terms of such loans shall comply with condition (ii) of clause (b) below;

(b)     secured loans to Borrower by banks or financing institutions other than the Bank, provided that:

(i)     the collateral for such loans, if any, shall be capital assets not pledged to the Bank and shall not afford such bank or financing institution a ratio of asset value to loan principal greater than the comparable ratio required hereby; and

(ii)     the terms of such loans shall not be more restrictive upon Borrower and/or its Subsidiaries than the terms hereof, nor shall the terms of such loans include any negative pledge agreement or other covenant or condition which would limit the ability of the Borrower and/or its Subsidiaries thereof to alter, amend, or provide for additional collateral for, this Agreement or any of the Affiliate Agreements; and

(c)     secured loans to Borrower effected by participation in additional Revolving Credit Loans hereunder provided that appropriate adjustment in the terms and conditions hereunder are made in the opinion of the Bank;

(d)        additional loans by the Bank to the Borrower on such terms as it and the Bank may agree;

(e)        secured and unsecured loans in connection with the acquisition and maintenance of a certain G-450 Aircraft or other aircraft (inclusive of spare parts) not to exceed $15,000,000 in the aggregate; and

(f)        secured and unsecured loans in connection with the construction, maintenance and operation of that certain Pier 57 property located in Brooklyn, New York, not to exceed $5,000,000 in the aggregate.

For the avoidance of doubt, Additional Approved Financings shall not be deemed to be Investments.

"Assignments" has the meaning ascribed thereto in subsection 2.15(a)(ii)(C).

"Attributable Indebtedness" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"B No. 210 Co." means B. No. 210 Corp., a New York corporation.

"B No. 215 Co." means B. No. 215 Corp., a New York corporation.

"B No. 225 Co." means B. No. 225 Corp., a New York corporation.

"B No. 245 Co." means B. No. 245 Corporation, a New York corporation.

"B No. 250 Co." means B. No. 250 Corp., a New York corporation.

"B No. 260 Co." means B. No. 260 Corporation, a New York corporation.

"Brendan Bouchard Co." means Tug Brendan J. Bouchard Corp., a New York corporation.

"Bank" has the meaning ascribed thereto in the preamble.

"Borrower(s)" has the meaning ascribed thereto in the preamble.

"Borrowing Notice" has the meaning ascribed thereto in subsection 2.1(b).

"Business Day" means any day other than a Saturday, Sunday or any other day on which commercial banks are authorized or required to close under the laws of, or are in fact closed in, the State of New York.

"Capitalized Lease" means any lease the obligations to pay rent or other amounts under which constitute Capitalized Lease Obligations.

"Capitalized Lease Obligations" means, as to any Person, the obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real and/or personal property which obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP and, for purposes of this Agreement the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Cash" means, as to any Person, such Person's cash and cash equivalents, as defined in accordance with GAAP.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. 9601, et seq., as amended from time to time.

"Closing" has the meaning ascribed thereto in Section 4.1.

"Closing Date" has the meaning ascribed thereto in Section 4.1.

"Code" means the Internal Revenue Code of 1986, as it may be amended from time to time.

"Collateral" means all of the assets and properties covered by each of the respective Security Documents; provided, that there shall be excluded from the Collateral (a) any obligation or property of any kind due from, owed by, or belonging to, a Sanctioned Person or Sanctioned Entity or (b) any lease in which the lessee is a Sanctioned Person or Sanctioned Entity.

"Commitment" means the obligation of the Bank to make Line of Credit Loans or Revolving Credit Loans hereunder contained in Sections 2.1(a) and 2.1(b) respectively but subject to the terms and conditions hereof.

"Commitment Fee" has the meaning ascribed thereto in Section 2.8.

"Compliance Certificate" means a certificate executed by the president or chief financial officer of the Borrower in the form of Exhibit B hereto and to the effect that: (i) as of the effective date of the certificate, no Default or Event of Default under this Agreement exists or would exist after giving effect to the action intended to be taken by the Borrower as described in such certificate, including, without limitation, that the covenants set forth in Section 6.9 hereof would not be breached after giving effect to such action, together with a calculation in reasonable detail, and in form satisfactory to the Bank, of such compliance, and (ii) the representations and warranties contained in Article 3 hereof are true and with the same effect as though such representations and warranties were made on the date of such certificate, except for changes in the ordinary course of business none of which, either singly or in the aggregate, have had a Material Adverse Effect on the Borrower.

"Consolidated" shall mean, when used with reference to financial statements or financial statement items of the Loan Parties and their Subsidiaries or any other Person, such statements or items on a consolidated basis in accordance with the consolidation principles of GAAP.

"Consolidated Funded Debt" shall mean, as of any date of determination, Funded Debt of the Loan Parties and their Subsidiaries on a Consolidated basis.

"Conversion Notice" has the meaning ascribed thereto in Section 2.2.

"Danielle Bouchard Co." means Tug Danielle M. Bouchard Corp., a New York corporation.

"Debt Instrument" has the meaning ascribed thereto in subsection 8.4(a).

"Default" means an event which with notice or lapse of time, or both, would constitute an Event of Default.

"Discharge" has the meaning set forth in section 1001(7) of OPA.

"Disposal" means the discharge, deposit, injection, dumping, spilling, leaking or placing of any hazardous materials into or on any land or water so that such hazardous materials or constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

"DOC" means a document of compliance issued to an Operator in accordance with rule 13 of the ISM Code;

"Dollars" and "$" means lawful money of the United States of America.

"Earnings Assignment(s)" has the meaning ascribed thereto in subsection 2.15(a)(ii)(B).

"EBITDA" means, as to any Person, for any period, (a) the net income (exclusive of income from extraordinary events) of such Person before all income taxes paid or payable by such Person with respect to such period plus, but only to the extent such items shall have been deducted in determining such net income (b) the sum (without duplication) of (i) depreciation and amortization of assets, including goodwill and other intangible assets plus (ii) interest payable to other than related Persons plus (iii) maintenance and repair costs for vessels owned by the Loan Parties and their Affiliates that are in excess of $8,000,000 per fiscal quarter; provided, that such maintenance and repair costs are in excess of such Person's planned maintenance and repair costs for such period, unusual or unexpected and incurred in the ordinary course of business; as to all of the foregoing, as determined in accordance with GAAP.

"Employee Benefit Plan" means any employee benefit plan within the meaning of section 3(3) of ERISA which (a) is maintained for employees of the Borrower or any of its ERISA Affiliates or (b) has at any time within the preceding six (6) years been maintained for employees of any Loan Party or any current or former ERISA Affiliate.

"Environmental Laws and Regulations" means all federal, state, local and foreign environmental, health and safety laws, regulations, ordinances, orders, judgments, permits, concessions, grants, franchises, licenses, agreements, decrees or governmental restrictions

applicable to the Borrower or any other Loan Party, or any of their respective assets or properties.

"Environmental Liability" means any OPA Liability or any liability under any applicable Environmental Laws and Regulations for any disposal, Release or threatened release of a Hazardous Substance pollutant or contaminant as those terms are defined under CERCLA, and any liability which would require a removal, remedial or response action, as those terms are defined under CERCLA, by any Person or any environmental regulatory body having jurisdiction over the Borrower or any other Loan Party and/or any liability arising under any Environmental Laws and Regulations for the Borrower' or any other Loan Party's failure to comply with such laws and regulations, including without limitation, the failure to comply with or obtain any applicable environmental permit.

"Environmental Proceeding" means any judgment, action, proceeding or investigation pending before any court or governmental authority, with respect to a Borrower or any other Loan Party and arising under or relating to any Environmental Laws and Regulations.

"ERISA" means the Employee Retirement Income Security Act of 1974, as it may be amended from time to time, and the regulations promulgated thereunder.

"ERISA Affiliate" means, with respect to any Loan Party, any corporation, person or trade or business which is a member of a group which is under common control with any Loan Party, who together with any Loan Party, is treated as a single employer within the meaning of sections 414(b) - (o) of the Code and, if applicable, sections 4001(a)(14) and (b) of ERISA.

"Eurodollar Business Day" means a Business Day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Eurodollar Loan" means Loans the interest on which is determined on the basis of the rate referred to in the definition of LIBOR in this Article 1.

"Eurodollar Rate" means for any Eurodollar Loan for any Interest Period therefor, the rate per annum (rounded upwards, if necessary, to the nearest 1 / 100 of 1 %) determined by the Bank to be equal to (a) the LIBOR for such Loan for such Interest Period; divided by (b) 1 minus the Reserve Requirement for such Loan for such Interest Period.  The Bank shall use its commercially reasonable best efforts to advise the Borrower of the Eurodollar Rate as soon as practicable after each change in the Eurodollar Rate; provided, however, that the failure of the Bank to so advise the Borrower on any one or more occasions shall not affect the rights of the Bank or the obligations of the Borrower hereunder.

"Evening Star Co." means Tug Evening Star Corp., a New York corporation.

"Event of Default" has the meaning ascribed thereto in Article 8.

"FDIC" means the Federal Deposit Insurance Corporation or any successor organization.

"Financial Statements" means the audited Consolidated Balance Sheets of Borrower and its Subsidiaries, as at December 31, 2010, 2011 and 2012, together with the related audited Consolidated Income Statement and Statement of Changes in Cash Flow for the fiscal years then ended.

"Funded Debt" shall mean, with respect to any Person, without duplication, all Indebtedness of such Person.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" shall mean each of B No. 210 Co., B No. 215 Co., B No. 225 Co., B No. 245 Co., B No. 250 Co., B No. 260 Co., Brendan Bouchard Co., Danielle Bouchard Co., Evening Star Co., Jane Co., and "Guarantors" shall collectively refer to all of them.  For the avoidance of any doubt, the only Guarantors are the Persons named in the preceding sentence, and no other Person shall be a Guarantor unless such Person agrees in writing to be joined as a Guarantor to the Loan Documents.  Without limiting the generality of the foregoing sentence, no trust and no natural Person, including, without limitation, Morton S. Bouchard, III, any member of the family of Morton S. Bouchard, III or any trust controlled by any of them is a Guarantor.

"Guaranty(ies)" has the meaning ascribed thereto in Section 2.14.

"Hazardous Materials" means any toxic chemical, Hazardous Substances, contaminants or pollutants, medical wastes, infectious wastes, or hazardous wastes.

"Hazardous Substance" has the meaning set forth in section 101(14) of CERCLA or comparable provisions of state or local law.

"Hazardous Waste" has the meaning set forth in the Resource Conservation and Recovery Act, 42 U.S.C. '9603(5), and the Environmental Protection Agency's implementing regulations, or state or local law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)      all obligations of such Person for borrowed money;

(b)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(c)     all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(d)     indebtedness (including prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)     Capitalized Leases;

(f)     all obligations, contingent or otherwise, of such Person as an account party or applicant in respect of letters of credit (and bankers' acceptances, bank guaranties, surety bonds and similar instruments) created for the account or upon the application of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation, plus accrued and unpaid dividends;

(h)     all guarantees (direct or indirect) of such Person in respect of any of the foregoing; and

(i)     all liabilities which would be reflected on a balance sheet of such Person, prepared in accordance with GAAP.

For purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any Capital Lease as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"Insurance Assignments" has the meaning ascribed thereto in subsection 2.15(a)(ii)(C).

"Interest Period" shall mean, with respect to any Eurodollar Loan,

(a)     initially, the period commencing on the date on which such Eurodollar Loan is made or converted, as the case may be, with respect to such Eurodollar Loan and ending one, two, three, six, or twelve months thereafter, subject to availability to the Bank, as selected by the Borrower in the Borrowing Notice or Conversion Notice given with respect thereto; and

(b)     thereafter, each period commencing on the last day of the immediately preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three,

six, or twelve months thereafter, subject to availability to the Bank, as selected by the Borrower by irrevocable notice to the Bank prior to the last Eurodollar Business Day of the then current Interest Period with respect thereto; provided that the foregoing provisions are subject to the following:

(i)      if any Interest Period pertaining to a Eurodollar Loan would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)     any Interest Period pertaining to a Eurodollar Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the relevant calendar month;

(iii)    if the Borrower shall fail to give notice as provided above, the Borrower shall be deemed to have selected a Prime Rate Loan to replace the affected Eurodollar Loan;

(iv)     no Interest Period in respect of any Loan shall extend beyond the applicable Maturity Date; and

(v)      no more than twenty (20) Eurodollar Loans may be in effect at any time.  For purposes hereof, Eurodollar Loans with different Interest Periods shall be considered as separate Eurodollar Loans, even if they shall begin on the same date and have the same duration, although borrowings, extensions and conversions may, in accordance with the provisions hereof, be combined at the end of existing Interest Periods to constitute a new Eurodollar Loan with a single Interest Period.

"Investment" means, in respect of any Person:

(a)      the amount paid or committed to be paid, or the value of property or services contributed or committed to be contributed, by such Person for or in connection with the acquisition by such Person of any stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person; and

(b)      the amount of any advance, loan or extension of credit by such Person, to any other Person, or guaranty or other similar obligation of such Person with respect to any Indebtedness of such other Person, and (without duplication) any amount committed to be advanced, loaned, or extended by such Person to any other Person, or any amount the payment of which is committed to be assured by a guaranty or similar obligation by such Person for the benefit of, such other Person.

"IRS" means the Internal Revenue Service.

"ISM Code" shall mean the International Safety Management Code for the Safe Operating of Ships and for Pollution Prevention constituted pursuant to Resolution A.741(18) of the International Maritime Organization and incorporated into the Safety of Life at Sea Convention and includes any amendments or extensions thereto and any regulation issued pursuant thereto.

"ISPS Code" shall mean the International Ship and Port Facility Code adopted by the International Maritime Organization at a conference in December 2002 and amending Chapter XI of the Safety of Life at Sea Convention and includes any amendments or extensions thereto and any regulation issued pursuant thereto.

"ISSC" shall mean the International Ship Security Certificate issued pursuant to the ISPS Code.

"Jane Co." means Tug Jane A. Bouchard Corp., a New York corporation.

"Leases" means leases and subleases (other than Capitalized Leases), licenses for the use of real property, easements, grants, and other attachment rights and similar instruments under which a Borrower has the right to use real or personal property or rights of way.

"LIBOR" means with respect to any Eurodollar Loan for any Interest Period therefor, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on Reuters Screen LIBOR01 Page (or any successor page) as the London interbank offered rate for deposits in Dollars at approximately 11:00 A.M. (London time) two (2) Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period.  If for any reason such rate is not available, then "LIBOR" shall mean the rate per annum at which, as determined by the Bank in accordance with its customary practices, Dollars in an amount comparable to the Loans then requested are being offered to leading banks at approximately 11:00 A.M. London time, two (2) Business Days prior to the commencement of the applicable Interest Period for settlement in immediately available funds by leading banks in the London interbank market for a period equal to the Interest Period selected.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien (statutory or otherwise), charge, preference, priority or other preferential arrangement in the nature of a security interest of any kind (including any agreement to give any of the foregoing), any conditional sale or other title retention agreement, any lease in the nature of any of the foregoing, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"Loan(s)" means the Loans described in Section 2.1 hereof.

"Loan Documents" means this Agreement, the Note, the Guaranties, the Security Documents and all other documents executed and delivered in connection herewith or therewith, including all amendments, modifications and supplements of or to all such documents.

"Loan Party" means the Borrower, any Guarantor and any other Person (other than the Bank) which now or hereafter executes and delivers to the Bank any Loan Document.

10

"Loss" has the meaning ascribed thereto in subsection 2.6(a)(i).

"Management Fees" means, for any period, all fees, emoluments or similar compensation paid or incurred by any Person (other than any such fees, emoluments or similar compensation paid to or incurred and payable to the Borrower) in respect of services rendered in connection with the management or supervision of the management of such Person, or the construction, operation and maintenance of the Vessels operated by the Borrower, other than salaries, bonuses and other compensation paid to any full-time executive employee in respect of such full-time employment.

"Material Adverse Effect" means, with respect to any Person, a material adverse effect on: (a) the business, condition (financial or otherwise), assets, liabilities or operations of such Person, (b) the ability of such Person to perform its obligations under any Loan Document to which it is a party, or (c) the validity or enforceability of this Agreement or the other Loan documents or the rights or remedies of the Bank hereunder or thereunder.

"Maturity Date" means the earliest of (i) October 30, 2018 and (ii) the date on which any Loans hereunder shall become due and payable as described in Article 8 hereof.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate is making, or is accruing an obligation to make, contributions or has made, or been obligated to make, contributions within the preceding six (6) years.

"New Type Loans" has the meaning ascribed thereto in Section 2.20.

"Note" shall mean the promissory note described in Section 2.1 hereof.

"Obligations" means, collectively, all of the Indebtedness, liabilities and obligations of the Borrower to the Bank, whether now existing or hereafter arising, whether or not currently contemplated, including, without limitation, those arising under the Loan Documents.

"OFAC" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"OPA" means the Oil Pollution Act of 1990, 33 U.S.C. '2701 et, seq., as amended from time to time.

"OPA Liability" means any liability for any Discharge or any substantial threat of a Discharge, as those terms are defined under OPA, and any liability for removal, removal costs and damages, as those terms are defined under OPA, by any Person or any environmental regulatory body having jurisdiction over the Borrower or any other Loan Party.

"Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"Payment Date" means (a) as to any Prime Rate Loan, the last Business Day of each March, June, September and December and on the applicable Maturity Date, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, (i) each three (3) month anniversary following the first day of such Interest Period and (ii) the last day of such Interest Period and (c) as to any Loan which is the subject of a mandatory prepayment required pursuant to Section 2.6, the date on which such mandatory prepayment is due.

"Payment Office" means the office of the Bank located at 58 S. Service Road, Suite 100, Melville, NY 11747.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permitted Liens" means, as to any Person: (a) pledges or deposits by such Person under workers' compensation laws, unemployment insurance laws, social security laws, or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness of such Person), or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of Cash or United States Government Bonds to secure surety, appeal, performance, customs or other similar bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent; (b) Liens imposed by law, such as carriers', warehousemen's, materialmen's and mechanics' liens, or Liens arising out of judgments or awards against such Person with respect to which such Person at the time shall currently be prosecuting an appeal or proceedings for review; (c) Liens for taxes not yet subject to penalties for non-payment and Liens for taxes the payment of which is being contested as permitted by Section 6.6; (d) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of, others for rights of way, highways and railroad crossings, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties; (e) Liens incidental to the conduct of the business of such Person or to the ownership of such Persons property that were not incurred in connection with Indebtedness of such Person, all of which Liens referred to in the preceding clause (e) do not in the aggregate materially detract from the value of the properties to which they relate or materially impair their use in the operation of the business taken as a whole of such Person, and as to all the foregoing only to the extent arising and continuing in the ordinary course of business; (f) Liens in favor of the Bank; (g) the interest of the shipyard in vessels being built for or retrofitted for Borrower or its Subsidiaries during the period prior to delivery of the vessel(s) under the applicable contract; and (h) Liens otherwise expressly permitted by this Agreement.

"Person" means an individual, a corporation, a limited liability company, a partnership, a joint venture, a trust or unincorporated organization, a joint stock company or other similar organization, a Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Post-Default Rate" means (a) in respect of the Loans, a rate per annum equal to 2% above the Prime Rate as in effect at the time of the Event of Default that resulted in the Post-Default Rate being instituted and as in effect thereafter from time to time until such Event of Default has been cured or waived by the Bank (but in no event less than the interest rate in effect

on the due date); and (b) in respect of other amounts payable by the Borrower hereunder (other than interest) not paid when due (whether at stated maturity, by acceleration or otherwise), a rate per annum during the period commencing on the due date until such other amounts are paid in full equal to 2% above the Prime Rate as in effect at the time of the due date and as in effect thereafter from time to time (but in no event less than the interest rate in effect on the due date).

"Prime Rate" means at any time, the rate of interest per annum publicly announced or otherwise identified from time to time by Wells Fargo Bank, National Association at its principal office in Charlotte, North Carolina as its prime rate.  Each change in the Prime Rate shall be effective as of the opening of business on the day such change in the Prime Rate occurs.  The parties hereto acknowledge that the rate announced publicly by Wells Fargo, National Association as its Prime Rate is an index or base rate and shall not necessarily be its lowest or best rate charged to its customers or other banks.

"Prime Rate Loans" means Loans that bear interest at a rate based on the Prime Rate.

"Principal Office" means the principal office of the Bank presently located at 58 S. Service Road, Suite 100, Melville, NY 11747.

"Purchase Money Security Interest" has the meaning ascribed thereto in subsection 7.2(b)(iii).

"Quarterly Dates" means the last day of each March, June, September and December, provided that, if any such date is not a Eurodollar Business Day, the relevant Quarterly Date shall be the next succeeding Eurodollar Business Day (or, if the next succeeding Eurodollar Business Day falls in the next succeeding calendar month, then on the next preceding Eurodollar Business Day).

"Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System, as the same may be amended or supplemented from time to time.

"Regulatory Change" means any change after the date of this Agreement in United States federal, state or foreign laws or regulations or the adoption or making after such date of any interpretations, directives or requests applying to a class of banks, including the Bank, of or under any United States federal, state or foreign laws or regulations (whether or not having the force of law) by any court or governmental or monetary authority charged with the interpretation or administration thereof; provided, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Regulatory Change", regardless of the date enacted, adopted or issued.

"Release" has the meaning set forth in section 10 1(22) of CERCLA or state or local law.

"Reserve Requirement" means, for any day, the percentage (expressed as a decimal and rounded upwards, if necessary, to the next higher 1/100th of 1%) which is in effect for such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any basic, supplemental or emergency reserves) in respect of Eurocurrency liabilities (as defined in Regulation D of such Board as in effect from time to time) or any similar category of liabilities for a member bank of the Federal Reserve System in New York City.  Without limiting the effect of the foregoing, the Reserve Requirement shall reflect any other reserves required to be maintained by such member banks by reason of any Regulatory Change against: (a) any category of liabilities that includes deposits by references to which the Eurodollar Rate for Eurodollar Loans is to be determined as provided in the definition of "LIBOR" in this Article 1, or (b) any category of extensions of credit or other assets that include Eurodollar Loans.

"Sanctioned Entity" shall mean (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a person or entity resident in or determined to be resident in a country, that is subject to a country sanctions program administered and enforced by OFAC.

"Sanctioned Person" shall mean a person named on the list of Specially Designated Nationals maintained by OFAC.

"Security Documents" has the meaning ascribed thereto in subsection 2.15(c).

"Ship Mortgage and Ship Mortgages" have the meanings ascribed thereto in subsection 2.15(a)(ii)(A).

"Shipping Act" means the Shipping Act of 1916, as amended and consolidated at 46 U.S.C. §55101.

"SMC" means the safety management certificate issued in respect of a Vessel in accordance with Rule 13 of the ISM Code.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, joint venture or other business entity whether now existing or hereafter organized or acquired: (a) in the case of a corporation or limited liability company, of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person and/or one or more Subsidiaries of such Person, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, by such Person, or (b) in the case of a partnership or joint venture in which such Person is a general partner or joint venturer or of which a majority of the partnership or other ownership interests are at the time beneficially owned by such Person and/or one or more of its Subsidiaries, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, by such Person.  Unless the context otherwise requires, references in this Agreement to "Subsidiary" or "Subsidiaries" shall be deemed to be references to a Subsidiary or Subsidiaries of the Borrower.

"Tangible Net Worth" means, as to any Person, the sum of capital surplus, earned surplus and capital stock, minus deferred charges, intangibles and treasury stock, all as determined in accordance with GAAP.

"Total Leverage Ratio" shall mean, as of any date of determination, for the Loan Parties and their Subsidiaries on a Consolidated basis, the ratio of (a) Consolidated Funded Debt on such date to (b) EBITDA for the four (4) consecutive quarters ending on such date.

"Trading with the Enemy Act" has the meaning ascribed thereto in subsection 3.21.

"Unused Commitment" means the aggregate principal amount of Loans which, at any time, remain available to Borrower pursuant to Section 2.1 hereof to be borrowed subject to the terms and conditions hereof.

"Vessels" means, collectively, the barges and tugs named as follows: the B No. 210 (Official Number 1037844), the B No. 215 (Official Number 1064767), the B No. 225 (Official Number 1139764), the B. No. 245 (Official Number 1050073), the B. No. 250 (Official Number 1235496), the B. No. 260 (Official Number 1210060), the Evening Star (Official Number 1234828), the Danielle M. Bouchard (Official Number 1053010), the Jane A. Bouchard (Official Number 1139762), and the Brendan J. Bouchard (Official Number 1086926), and any other tug or barge which shall be or become subject to the Bank's Lien pursuant hereto and, individually, "Vessel" means any of them.

Section 1.2    Accounting Terms.

Any accounting terms used in this Agreement that are not specifically defined herein shall have the meanings customarily given to them in accordance with GAAP as in effect on the date of this Agreement, except that references in Article 5 to such principles shall be deemed to refer to GAAP as in effect on the date of the financial statements delivered pursuant thereto.

Section 1.3    Certain Interpretations.

The definitions set forth in Section 1.1 shall be equally applicable to both the singular and plural forms of the defined terms. The words "herein", "hereof" and words of similar import as used in this Agreement shall refer to this Agreement as a whole and not to any particular provision in this Agreement. Unless specifically stated to the contrary, all references to "Sections", "subsections," "paragraphs," "Exhibits" and "Schedules" in this Agreement shall refer to Sections, subsections, paragraphs, Exhibits and Schedules of this Agreement unless otherwise expressly provided; references to Persons include their respective permitted successors and assigns or, in the case of Governmental Authorities, Persons succeeding to the relevant functions of such persons; and all references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations.

Article 2.
Loans; Collateral

Section 2.1    Loans.

(a)     Subject to the terms and conditions of this Agreement, the Bank hereby agrees to make revolving credit loans to the Borrower in an aggregate principal amount outstanding at any one time of One Hundred Million and No/100 Dollars ($100,000,000.00) as follows:

(i)     The Bank shall make Loans to the Borrower during the period from the Closing Date to a date not later than the date occurring 30 days prior to the Maturity Date, in accordance with the procedure set forth in subsection 2.1(b) hereof.

(ii)     During the period from the making of each such Loan to the Maturity Date, the Borrower may convert each such Loan from one type into a Loan of another type (as provided in Section 2.16), provided, however, that no such Loan shall have an Interest Period which would terminate later than the Maturity Date and if, by reason of a Conversion Notice or otherwise, the type of such Loan would be such that its Interest Period would end on a date subsequent thereto, the Borrower shall elect that such Loan be a Prime Rate Loan.

(b)     The Borrower shall give the Bank written notice of each borrowing of each Loan (in each case, a "Borrowing Notice").  Each Borrowing Notice shall be irrevocable and shall be effective only if received by the Bank not later than 4:00 p.m., New York City time, on the date of the related borrowing.  Each Borrowing Notice shall (i) specify the amount (subject to the limitations set forth in subsection 2.1(a)) and the type of Loan to be borrowed, the date of borrowing (which shall be: (x) a Business Day in the case of each borrowing of a Prime Rate Loan and (y) a Eurodollar Business Day in the case of each borrowing of a Eurodollar Loan) and the duration of the initial Interest Period if such Loan is to be a Eurodollar Loan and (2) be accompanied by the certificates and documents set forth in Section 4.3.

Section 2.2     Notices Relating to Loans.

The Borrower shall, except as provided in Section 4.2 hereof, give the Bank written notice of each conversion and prepayment of each Loan and of the duration of each Interest Period applicable to each Loan (in each case, a "Conversion Notice").  Each Conversion Notice shall be irrevocable and shall be effective only if received by the Bank not later than 4:00 p.m., New York City time, on the date that is:

(a)     in the case of each notice of termination, reduction or prepayment of, or conversion into, Prime Rate Loans, the date (which shall be a Business Day) of the related termination, reduction, prepayment or conversion; and

(b)     In the case of each notice of prepayment of, or conversion into, Eurodollar Loans, or the duration of an Interest Period for Eurodollar Loans, the date (which shall be a Eurodollar Business Day) of the related prepayment, or conversion or the first day of such Interest Period.

Each Conversion Notice of termination or reduction shall specify the amount thereof.  Each such notice of conversion or prepayment shall specify the amount and type of Loans to be converted or prepaid (and, in the case of a conversion, the type of Loans to result from such conversion), the date of conversion or prepayment (which shall be: (i) a Business Day in the case of each

conversion or prepayment of Prime Rate Loans, and (ii) a Eurodollar Business Day in the case of each conversion or prepayment of Eurodollar Loans and each conversion of or into a Eurodollar Loan).  Each such notice of the duration of an Interest Period shall specify the Loans to which such Interest Period is to relate.

Section 2.3     Disbursement of Loan Proceeds.

The Borrower shall give the Bank notice of each borrowing hereunder as provided in subsection 2.1(b).  Not later than 4:00 p.m., New York City time, on the date specified for each borrowing hereunder, the Bank shall disburse the amount of such Loan to Borrower by depositing the amount thereof in an account of the Borrower as designated by the Borrower, provided that on the Closing Date the proceeds of loans shall be disbursed so as to comply with subsection 4.2(i) hereof.

Section 2.4     Note.

The Loans shall be evidenced by a single promissory note (the "Note") of the Borrower payable to the Bank and dated the Closing Date.  The Note shall be in the principal amount of One Hundred Million and No/100 Dollars ($100,000,000.00) and shall be in the form of Exhibit A annexed hereto.

Section 2.5     Repayment of Principal of Loans.

(a)     The aggregate principal amount of the Loans shall be payable in one installment on the Maturity Date in the full amount of the principal balance thereof outstanding on such date.

(b)     Any prepayment of less than the entire outstanding principal balance of the Loans (other than those resulting from a Loss described in Section 2.6) shall be applied (i) first to the payment of all accrued interest on the amount so prepaid to and including the date of prepayment, (ii) second to the payment of any amounts due in respect of such Loans being repaid other than principal and interest, and (iii) third to the payment of principal under the Loans (provided, that, except as set forth in Section 2.17, 2.18 and 2.20, all payments and repayments made pursuant to the terms hereof in respect of the Note shall be applied first to Prime Rate Loans outstanding thereunder, and shall be applied to Eurodollar Loans only to the extent any such payment exceeds the principal amount of Prime Rate Loans outstanding on such Note at the time of such payment).

(c)     If an Event of Default exists, notwithstanding the preceding sentence or any other provisions of this Agreement to the contrary, all amounts collected or received by the Bank on account of the Obligations or any other amounts outstanding under any of the Loan Documents or in respect of the Collateral shall be paid over or delivered as follows (irrespective of whether the following costs, expenses, fees, interest, premiums, scheduled periodic payments or Obligations are allowed, permitted or recognized as a claim in any proceeding resulting from the occurrence of a bankruptcy, insolvency or similar proceeding):

FIRST, to the payment of all out of pocket costs and expenses (including, without limitation, reasonable attorneys' fees) of the Bank in connection with enforcing its rights under

the Loan Documents and any protective advances made by the Bank with respect to the Collateral under or pursuant to the terms of the Security Documents;

SECOND, to the payment of any fees owed to the Bank;

THIRD, to the payment of all of the Obligations consisting of accrued fees and interest, and including, with respect to any interest rate hedging or similar transaction with the Bank or an Affiliate thereof, any fees, premiums and scheduled periodic payments due under such agreement and any interest accrued thereon;

FOURTH, to the payment of the outstanding principal amount of the Obligations, and including with respect to any interest rate hedging or similar transaction with the Bank or an Affiliate thereof, any breakage, termination or other payments due under such agreement and any interest accrued thereon;

FIFTH, to all other Obligations and other obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" through "FOURTH" above; and

SIXTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

Section 2.6    Mandatory and Voluntary Prepayments.

(a)    (i) In the event of an actual, constructive, agreed or compromised total loss of, or requisition of title to, or seizure or forfeiture of, one or more Vessels (a "Loss"), the Borrower may, at its option: (A) prepay the Loans in an amount equal to the agreed value of each Vessel subject to a Loss as set forth on Schedule 3.5, on the earlier of: (x) the one hundred twentieth (120th) day following the Loss of such Vessel(s); or (y) the date on which payment is received of the amount payable as a result of such Loss or (B) no later than thirty (30) days after such Loss shall have occurred, assign and pledge to the Bank additional collateral to secure the due payment of the Obligations by granting, or causing to be granted, to the Bank, with respect to an additional Lien free barge, tug or other vessel or vessels having an aggregate value (as determined by the Bank in its sole discretion) at least equal to the agreed value (as set forth on Schedule 3.5) of the Vessel or Vessels subject to such Loss: (x) a first preferred ship mortgage substantially in the form of the Ship Mortgages; (y) a first assignment covering the earnings and requisition compensation, if any, of each such barge, tug or other vessel, in substantially the form of the Earnings Assignment; and (z) a first assignment covering the insurances of each such barge, tug or other vessel in substantially the form of the insurance Assignment, and in each case otherwise in form and substance satisfactory to the Bank in its sole discretion; provided, however, that the Borrower only shall be permitted to elect to deliver such additional collateral in lieu of the repayment otherwise required by the preceding clause (A) hereof if, upon the delivery thereof, the Borrower shall then be in compliance with the requirements of Section 6.16 and no Event of Default shall have occurred and be continuing.

18

(ii)     An actual total loss of a Vessel shall be deemed to have occurred on the date that such Vessel is lost or, if the date of loss is unknown, the date on which such Vessel is last reported.  A constructive total loss shall be deemed to have occurred on the date that notice of abandonment of a Vessel is given to the insurers of such Vessel, provided that a claim for total loss is admitted by such insurers or, if such insurers do not admit such claim, on the date that a total loss is subsequently adjudged to have occurred. An agreed or compromised total loss shall be deemed to have occurred on the date of such agreement or compromise.

(iii)    Any such prepayment shall be made together with payment of accrued interest on the amount prepaid to and including the date of prepayment, without premium or penalty, but shall include any related breakage and termination costs and fees that are provided for in this Agreement (if any).

(b)     The Borrower may, at its option, upon not less than thirty (30) days' prior written notice to the Bank (which notice shall be irrevocable and specify which Loans are to be prepaid), prepay the aggregate outstanding principal amount of the Loans in full at any time, or in part from time to time without premium or penalty.  Each such prepayment shall be in an amount equal to One Hundred Thousand Dollars ($100,000) or an integral multiple thereof, and shall be made together with a payment of all accrued interest on the principal amount prepaid to and including the date of prepayment.

(c)     If at any time after the Closing Date, the sum of the aggregate principal amount of outstanding Loans shall exceed $100,000,000, the Borrower shall immediately prepay the Loans in an amount sufficient to eliminate such excess (such prepayment to be applied as set forth in subsection (e) below).

(d)     The Borrower shall, from time to time, prepay the Loans to the extent required by Section 6.16 (such prepayment to be applied as set forth in subsection (e) below).

(e)     Any prepayment of less than the entire outstanding principal balance of the Loans (other than those resulting from a Loss) shall be applied in accordance with Section 2.5

Section 2.7     Interest.

(a)     The Borrower shall pay to the Bank interest on the unpaid principal amount of each Loan for the period commencing on the date of such Loan until such Loan shall be paid in full, at the following rates per annum:

(i)     During such periods that such Loan is a Prime Rate Loan, at a rate equivalent to the Prime Rate plus the Applicable Margin; and

(ii)    During such periods that such Loan is a Eurodollar Loan, for each Interest Period relating thereto, the Eurodollar Rate for such Loan for such Interest Period plus the Applicable Margin.

19

(b)     Notwithstanding the foregoing, the Borrower shall pay interest on any Loan or any installment thereof, and on any other amount payable by the Borrower hereunder (to the extent permitted by law) which shall not be paid in full when due (whether at stated maturity, by acceleration or otherwise) for the period commencing on the due date thereof until the same is paid in full at the applicable Post-Default Rate.

(c)     Except as provided in the next sentence, accrued interest on each Loan shall be payable: (i) on the applicable Payment Date, and (ii) in the case of any Loan, upon the payment or prepayment thereof or the conversion thereof into a Loan of another type (but only on the principal so paid, prepaid or converted).  Interest that is payable at the Post-Default Rate shall be payable from time to time on demand of the Bank.  Promptly after the establishment of any interest rate provided for herein or any change therein, the Bank will notify the Borrower thereof, provided that the failure of the Bank to so notify the Borrower shall not affect the obligations of the Borrower hereunder or under the Note in any respect.

(d)     Anything in this Agreement or the Note to the contrary notwithstanding, the obligation of the Borrower to make payments of interest shall be subject to the limitation that payments of interest shall not be required to be made to the Bank to the extent that the Bank's receipt thereof would not be permissible under the law or laws applicable to the Bank limiting rates of interest which may be charged or collected by the Bank.  Any such payments of interest which are not made as a result of the limitation referred to in the preceding sentence shall be made by the Borrower to the Bank on the earliest interest payment date or dates on which the receipt thereof would be permissible under the laws applicable to the Bank limiting rates of interest which may be charged or collected by the Bank.  Such deferred interest shall not bear interest.

Section 2.8     <u>Commitment Fee</u>.

The Borrower shall pay by wire transfer initiated by the Borrower to the Bank (and not automatically deducted by the Bank from the Borrower's account(s) with the Bank) a commitment fee (the "<u>Commitment Fee</u>") on the daily average amount of the Unused Commitment for the period from the Closing Date to and including the Maturity Date, at the rate of twenty-five basis points (0.25%) per annum on the Unused Commitment.  The accrued Commitment Fee shall be payable quarterly on the last day of each March, June, September and December of each year, commencing on the first such date after the Closing Date and on the Maturity Date.

Section 2.9     <u>Computations</u>.

Interest payable hereunder with respect to any Prime Rate Loan shall be calculated on the basis of a year of 365 days (or 366 days, as applicable) for the actual days elapsed.  All other fees, interest and all other amounts payable hereunder shall be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last) occurring in the period for which payable.

Section 2.10    <u>Minimum Amounts of Conversions, Prepayments and Interest Periods</u>.

Except for conversions and prepayments that result in the conversion or prepayment of all Loans of a particular type (in the case of conversions or prepayments) or conversions made pursuant to Section 2.16, subsection 2.17(b) or Section 2.19, each conversion of Loans of one type into Loans of another type and each prepayment of principal of Loans hereunder shall be in an amount at least equal to Fifty Thousand Dollars ($50,000) in the case of Prime Rate Loans and One Hundred Thousand Dollars ($100,000) in the case of Eurodollar Loans or an integral multiple thereof (conversions and prepayments of different types of Loans at the same time hereunder to be deemed separate conversions and prepayments for purposes of the foregoing, one for each type).

Section 2.11   Lending Offices.

The Loans of each type made by the Bank shall be made and maintained at the Bank's Applicable Lending Office for Loans of such type.

Section 2.12   Time and Method of Payments.

All payments of principal, interest, fees and other amounts (including indemnities) payable by the Borrower hereunder shall be made in Dollars, in immediately available funds, to the Bank at the Payment Office not later than 4:00 p.m., New York City time, on the date on which such payment shall become due (and the Bank may, but shall not be obligated to, debit the amount of any such payment that is not made by such time to any ordinary deposit account of the Borrower with the Bank).  Additional provisions relating to payments are set forth in Section 9.3 hereof.

Section 2.13   Use of Proceeds of Loans.

The proceeds of the Loans shall be used by the Borrower for construction costs of new vessels to be acquired by the Borrower or its Subsidiaries and/or related capital expenditures, for the conversion by the Borrower and its Subsidiaries of existing single hull vessels into double hull vessels, for working capital and for general corporate purposes.  No portion of the proceeds of any Loan shall be used, in whole or in part, for the purpose of purchasing or carrying any "margin stock" as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System.  As used in this Section 2.13, the term "working capital" means expenditures in the ordinary course of business and does not include the payment of (or reimbursement of any party for) fines, penalties or damages under Environmental Laws and Regulations or Environmental Liabilities.

Section 2.14   Guaranties.

The due payment and performance of the Obligations shall be unconditionally guaranteed to the Bank by each of the Guarantors by the execution and delivery to the Bank of a Guaranty in the form of Exhibit C hereto (hereinafter referred to individually, together with any guaranty executed and delivered before or after the date hereof, as a "Guaranty" and collectively as the "Guaranties").

Section 2.15   Security.

(a)     In order to secure the due payment and performance by the Borrower of the Obligations, the Borrower shall on or before the Closing Date:

(A)     cause each Guarantor to execute and deliver to the Bank a preferred ship mortgage covering the Vessel owned by it in form and substance satisfactory to the Bank (each as amended, restated, supplemented or otherwise modified from time to time, a "Ship Mortgage" and collectively the "Ship Mortgages");

(B)     cause each Guarantor to execute and deliver to the Bank an assignment by such Guarantor covering the earnings and requisition compensation, if any, of such Vessel, in form and substance satisfactory to the Bank for the benefit of the Obligations hereunder (each, together with the earnings assignments referred to in subsection 2.15(b), as amended, restated, supplemented or otherwise modified from time to time, hereinafter sometimes referred to individually as an "Earnings Assignment" and together as the "Earnings Assignments") and execute itself and deliver to the Bank a security assignment of the earnings and requisition compensation of the Vessels;

(C)     cause each Guarantor to execute and deliver to the Bank an assignment by such Borrower covering the insurances of such Vessel, in form and substance satisfactory to the Bank for the benefit of the Obligations hereunder (each, together with the insurance assignments referred to in subsection 2.15(b), as amended, restated, supplemented or otherwise modified from time to time, hereinafter sometimes referred to individually as an Insurance Assignment" and together as the "Insurance Assignments"; the Earnings Assignments and the Insurance Assignments are hereinafter sometimes referred to individually as an "Assignment" and together as the "Assignments"); and

(D)     cause each Guarantor to execute and deliver, or cause to be executed and delivered, such other agreements, instruments and documents as the Bank may reasonably require in order to effect the purposes of this subsection 2.15(a) and this Agreement, including a confirmation that any documents herein referred to that have already been executed and delivered remain in effect for the benefit of the Obligations hereunder.

(b)     Each of the Ship Mortgages, Earnings Assignments and Insurance Assignments referred to in Subsection 2.15(a) above shall constitute a first lien on the property covered thereby.

(c)     All of the agreements, documents and instruments provided for or referred to in this Section 2.15 together with any and all agreements, instruments and documents executed and delivered to the Bank by any Person in order to secure the due payment and performance by the Borrower of the Obligations, including all amendments, modifications and restatements thereof and all replacements and substitutions therefor, are hereinafter sometimes referred to collectively as the "Security Documents".

Section 2.16   Conversions of Loans.

The Borrower shall have the right to convert Loans of one type into Loans of another type from time to time, provided that: (i) the Borrower shall give the Bank notice of each such conversion as provided in Section 2.2; (ii) Eurodollar Loans may be converted only on the last day of an Interest Period for such Loans; and (iii) except as required by Sections 2.17 or 2.20 hereof, no Prime Rate Loan may be converted into a Eurodollar Loan if on the proposed date of conversion a Default or an Event of Default exists, and provided, further, that no Loan may be continued as or converted into a Eurodollar Loan if such Eurodollar Loan would have an Interest Period ending after the Maturity Date for such loan or a portion thereof.  The Bank shall use its best efforts to notify the Borrower of the effectiveness of such conversion, and the new interest rate to which the converted Loans are subject, as soon as practicable after the conversion; provided, however, that any failure to give such notice shall not affect the Borrower's obligations, or the Bank's rights and remedies, hereunder in any way whatsoever.

Section 2.17    Additional Costs: Capital Requirements.

(a)    Notwithstanding any other provision of this Agreement (but subject to subsection 2.17(d)), if after the date of this Agreement any Regulatory Change shall change the basis of taxation of payments to the Bank (or any lending office) of the principal of or interest on any Loan or any Fees or other amounts payable hereunder in respect of Eurodollar Loans (other than taxes imposed on the overall net income of the Bank for any such Loans by the United States of America), or shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by the Bank (or any lending office) (except, in respect of Eurodollar Loans, any such reserve requirement which is reflected in the Eurodollar Rate), or shall impose on the Bank, the London interbank market or any other relevant market any other condition affecting this Agreement or any Eurodollar Loan and the result of any of the foregoing shall be to increase the net cost to the Bank of making or maintaining any Eurodollar Loan, or to reduce the amount of any sum received or receivable by the Bank hereunder or under the Note (whether of principal, interest or otherwise) by an amount deemed by the Bank to be material, then the Borrower will pay to the Bank, within 15 days after receipt by the Borrower of a certificate referred to in subsection 2.17(c), such additional amount or amounts as will compensate the Bank for such additional net costs incurred or reduction suffered.

(b)    Subject to subsection 2.17(d), if the Bank shall have determined that the adoption after the date hereof of, or any change after the date hereof in, any law, rule, regulation or guideline regarding capital adequacy, or any change after the date hereof in the interpretation or administration of any of the foregoing by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank (or any lending office) or the Bank's holding company with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Bank's capital or on the capital of the Bank's holding company, if any, as a consequence of this Agreement or the Loans made pursuant hereto to a level below that which the Bank or the Bank's holding company could have achieved but for such adoption, change or compliance (taking into consideration the Bank's policies and the policies of the Bank's holding company with respect to capital adequacy) by an amount deemed by the Bank to be material, then from time to time the Borrower shall pay, within 15 days after receipt by the Borrower of a certificate

23

referred to in subsection 2.17(c), to the Bank such additional amount or amounts as will compensate the Bank or the Bank's holding company for any such reduction suffered.

(c)     A certificate of the Bank setting forth such amount or amounts as shall be necessary to compensate the Bank or its holding company, as applicable, as specified in subsections 2.17(a) or (b), as the case may be, shall be delivered to the Borrower and shall be conclusive absent manifest error.   Any such certificate shall be accompanied by a notice indicating the circumstances or event that resulted in such claim for compensation.   The Borrower shall pay to the Bank the amount shown as due on such certificate within 15 days after receipt of such certificate by the Borrower.   Failure on the part of the Bank to demand compensation for any increased cost or reduction in amounts received or receivable or reduction in return on capital with respect to any period shall not constitute a waiver of its right to demand compensation with respect to such period or any other period.

(d)     Notwithstanding any other provision of this Section 2.17, the Bank shall not be entitled to compensation for any increased costs or reductions in amounts received or receivable or reduction in return on capital under this Section 2.17 unless the Bank represents to the Borrower that at the time it is the policy or general practice of the Bank to demand such compensation for comparable costs or reductions, if any, in similar circumstances, if any, with comparable provisions of other credit agreements for comparable customers.

Section 2.18     Limitation on Types of Loans.

Anything herein to the contrary notwithstanding, if, on or prior to the determination of an interest rate for any Eurodollar Loans for any Interest Period therefor, the Bank determines (which determination shall be conclusive):

(a)     by reason of any event affecting the money markets in the United States of America or the Eurodollar interbank market, quotations of interest rates for the relevant deposits are not being provided in the relevant amounts or for the relevant maturities for purposes of determining the rate of interest for such Loans under this Agreement; or

(b)     the rates of interest referred to in the definition of "LIBOR" in Article 1 upon the basis of which the rate of interest on any Eurodollar Loans for such period is determined, do not accurately reflect the cost to the Bank of making or maintaining such Loans for such period, then the Bank shall give the Borrower prompt notice thereof (and shall thereafter give the Borrower prompt notice of the cessation, if any, of such condition), and so long as such condition remains in effect, the Bank shall be under no obligation to make new Loans of such type or to convert Loans of any other type into new Loans of such type and the Borrower shall, on the last day(s) of the then current Interest Period(s) for the outstanding Loans of the affected type either prepay such Loans in accordance with Section 2.6 or convert such Loans into Loans of another type in accordance with Section 2.16.

Section 2.19     Illegality.

Notwithstanding any other provision in this Agreement, in the event that it becomes unlawful for the Bank or its Applicable Lending Office to: (i) honor its obligation to make Eurodollar Loans hereunder, or (ii) maintain Eurodollar Loans hereunder, then the Bank shall

promptly notify the Borrower thereof, describing such illegality in reasonable detail (and shall thereafter promptly notify the Borrower of the cessation, if any, of such illegality), and the Bank's obligation to make Eurodollar Loans and to convert other types of Loans into Eurodollar Loans hereunder shall, upon written notice given by the Bank to the Borrower, be suspended until such time as the Bank may again make and maintain Eurodollar Loans and the Bank's outstanding Eurodollar Loans shall be converted into Prime Rate Loans in accordance with Sections 2.16 and 2.20.

Section 2.20    Certain Conversions pursuant to Sections 2.17 and 2.19.

If the Loans of a particular type (Loans of such type are hereinafter referred to as "Affected Loans" and such type is hereinafter referred to as the "Affected Type") are to be converted pursuant to Section 2.17 or 2.19, the Bank's Affected Loans shall be converted into Prime Rate Loans (the "New Type Loans") on the last day(s) of the then current Interest Period(s) for the Affected Loans (or, in the case of a conversion required by subsection 2.17(b) or Section 2.19, on such earlier date as the Bank may specify to the Borrower) and, until the Bank gives notice as provided below that the circumstances specified in Section 2.17 or 2.19 that gave rise to such conversion no longer exist:

(a)    to the extent that the Bank's Affected Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Affected Loans shall be applied instead to its New Type Loans; and

(b)    all Loans that would otherwise be made by the Bank as Loans of the Affected Type shall be made instead as New Type Loans and all Loans of the Bank that would otherwise be converted into Loans of the Affected Type shall be converted instead into (or shall remain as) New Type Loans.

Section 2.21    Indemnification.

The Borrower shall pay to the Bank, upon the request of the Bank, such amount or amounts as shall compensate the Bank for any loss (including loss of profit), cost or expense incurred by the Bank (as reasonably determined by the Bank) as a result of:

(b)    any payment or prepayment or conversion of a Eurodollar Loan on a date other than the last day of an Interest Period for such Eurodollar Loan, other than as a result of any such prepayment or conversion required under Section 2.17 or 2.19; or

(c)    any failure by the Borrower to borrow a Eurodollar Loan on the date for such borrowing specified in the relevant Borrowing Notice under Section 2.1.

Such compensation shall include, without limitation, an amount equal to: (i) any loss or expense suffered by the Bank during the period from the date of receipt of such early payment or prepayment or the date of such conversion to the last day of such Interest Period if the rate of interest obtainable by the Bank upon the redeployment of an amount of funds equal to such payment, prepayment or conversion or failure to borrow or convert is less than the rate of interest applicable to such Eurodollar Loan for such Interest Period, or (ii) any loss or expense suffered by the Bank in liquidating Eurodollar deposits prior to maturity that correspond to such payment,

25

prepayment, conversion, failure to borrow or failure to convert. Without limiting the foregoing, Borrower shall pay to Bank a "yield maintenance fee" in respect of Eurodollar Loans in an amount computed as follows: The current rate for United States Treasury securities (bills on a discounted basis shall be converted to a bond equivalent) with a maturity date closest to the last day of the Interest Period applicable to the Loan as to which the prepayment is made, shall be subtracted from the LIBOR in effect at the time of prepayment. If the result is a positive number, then the resulting percentage shall be multiplied by the amount of the principal balance being prepaid. The resulting amount shall be divided by 360 and multiplied by the number of days remaining in the Interest Period during which the prepayment is made. Said amount shall be reduced to present value calculated by using the above-referenced United States Treasury securities rate and the number of days remaining in the applicable Interest Period. The resulting amount shall be the yield maintenance fee due to Bank upon the prepayment of a Eurodollar Loan. If by reason of an Event of Default, the Bank elects to declare the Notes or either of them to be immediately due and payable, then any yield maintenance fee with respect to such a Eurodollar Loan shall become due and payable in the same manner as though Borrower had exercised such right of prepayment.

The determination by the Bank of the amount of any such loss or expense, when set forth in a written notice to the Borrower, containing the Bank's calculation thereof in reasonable detail, shall be presumed correct, in the absence of manifest error.

Section 2.22   Telephonic Notices.

The Borrower hereby authorizes the Bank to extend, convert or continue Loans, effect selections of Types of Loans and to transfer funds based on telephonic notices made by any person or persons the Bank in good faith believes to be acting on behalf of any Borrower, it being understood that the foregoing authorization is specifically intended to allow Borrowing Notices and Conversion/Continuation Notices to be given telephonically. The Borrower agrees to deliver promptly to the bank a written confirmation, if such confirmation is requested by the Bank, of each telephonic notice signed by an authorized officer. If the written confirmation differs in any material respect from the action taken by the Bank, the records of the Bank shall govern absent manifest error.

Article 3.
Representations and Warranties.

The Borrower hereby represents and warrants to the Bank that:

Section 3.1   Organization.

(a)      Each of the Borrower and each Guarantor is duly organized and validly existing business corporation under the laws of the State of New York and has the power to own its assets and to transact the business in which it is presently engaged and in which it proposes to be engaged. The Borrower has full power and authority to own, operate and charter to others, vessels documented under the laws of the United States of America. Schedule 3.1 accurately and completely lists, as to each of the Borrower and each Guarantor: (i) the classes and number of authorized and outstanding shares of capital stock of each such corporation, and the owners of

26

such outstanding shares of capital stock, and (ii) the business in which each of such entities is engaged.  All of the foregoing shares or other equity interests that are issued and outstanding have been duly and validly issued and are fully paid and non-assessable, and are owned by the Persons referred to on Schedule 3.1, free and clear of any Lien except as otherwise provided for herein.  Except as set forth on Schedule 3.1, there are no outstanding warrants, options, contracts or commitments of any kind entitling any Person to purchase or otherwise acquire any shares of capital stock or other equity interests of either Borrower or any Guarantor nor are there outstanding any securities that are convertible into or exchangeable for any shares of capital stock or other equity interests of either Borrower or any Guarantor.  Except as set forth on Schedule 3.1, neither the Borrower nor any Guarantor has any Subsidiary.

(b)     Each of the Borrower and each Guarantor is in good standing in the State of New York and in each state in which it is qualified to do business.  There are no jurisdictions in which the character of the properties owned or proposed to be owned by the Borrower or any Guarantor or in which the transaction of the business of the Borrower or any Guarantor as now conducted or as proposed to be conducted requires or will require the Borrower or any Guarantor to qualify to do business and as to which failure so to qualify could have a Material Adverse Effect on the Borrower or any Guarantor.

(c)     Each of Borrower and each Guarantor is and will remain a "United States citizen" within the meaning of section 2 of the Shipping Act and is eligible to own and operate vessels in the coastwise trade.  Each Vessel was or will be built in the United States, has never been rebuilt outside the United States and has never been owned by any Person other than a "United States citizen" within the meaning of the Shipping Act.

Section 3.2     Power, Authority, Consents.

The Borrower and each Guarantor has the power to execute, deliver and perform the Loan Documents to be executed by it.  The Borrower has the power to borrow hereunder and has taken all necessary corporate action to authorize the borrowing hereunder on the terms and conditions of this Agreement.  The Borrower and each Guarantor has taken all necessary action, corporate or otherwise, to authorize the execution, delivery and performance of the Loan Documents to be executed by it.  No consent or approval of any Person (including, without limitation, any stockholder of any Guarantor), no consent or approval of any landlord or mortgagee, no waiver of any Lien or right of distraint or other similar right and no consent, license, approval, authorization or declaration of any Governmental Authority, bureau or agency, is or will be required in connection with the execution, delivery or performance by the Borrower or any other Loan Party, or the validity, enforcement or priority, of the Loan Documents or any Lien created and granted thereunder, except as set forth on Schedule 3.2, each of which either has been duly and validly obtained on or prior to the date hereof and is now in full force and effect, or is designated on Schedule 3.2 as waived by the Bank.

Section 3.3     No Violation of Law or Agreements.

The execution and delivery by the Borrower and each Guarantor of each Loan Document to which it is a party and performance by it hereunder and thereunder, will not violate any provision of law, including, without limitation: (a) Executive Order No. 8389, as amended and

supplemented of the President of the United States or any rules or regulations thereunder, (b) any Foreign, Cuban or Iranian Assets Control Regulations of the United States contained in Title 31, Code of Federal Regulations, Subchapter B, Chapter V, as amended, or (c) Executive Order No. 12722 dated August 2, 1990, and Executive Order No. 12724 dated August 9, 1990, prohibiting certain transactions with respect to Iraq, and will not, except as set forth on Schedule 3.2, conflict with or result in a breach of any order, writ, injunction, ordinance, resolution, decree, or other similar document or instrument of any court or Governmental Authority, bureau or agency, domestic or foreign, or any certificate of incorporation or by-laws of either Borrower or any other corporate Loan Party, or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any agreement, bond, note or indenture to which either Borrower or any other Loan Party is a party, or by which any of them is bound or any of their respective properties or assets is affected, or result in the imposition of any Lien of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of the Borrower or any other Loan Party, except for the Liens created and granted pursuant to the Security Documents.

Section 3.4     <u>Due Execution, Validity, Enforceability</u>.

This Agreement and each other Loan Document to which any Loan Party is a party has been duly executed and delivered by the Loan Party that is a party thereto and each constitutes the valid and legally binding obligation of the Borrower or such other Loan Party that is a party thereto, enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws, now or hereafter in effect, relating to or affecting the enforcement of creditors' rights generally and except that the remedy of specific performance and other equitable remedies are subject to judicial discretion.

Section 3.5     <u>Properties, Priority of Liens; Vessel Classification, Documentation, Insurance, etc</u>.

(a)     The Borrower and each Guarantor is the sole owner of the whole of the Vessel set forth opposite its name on Schedule 3.5.  All of the properties and assets owned by the Borrower and all of the properties and assets owned by each Guarantor (including the Vessels) are owned by each of them, respectively, free and clear of any Lien of any nature whatsoever, except as provided for in the Security Documents, and as permitted by Section 7.2.  The Liens that, simultaneously with the Closing, have been created and granted by the Security Documents constitute valid perfected first Liens on the properties and assets covered by the Security Documents, subject to no prior or equal Lien except as permitted by Section 7.2.  Each Ship Mortgage, when duly executed and delivered by the relevant Loan Party, will be effective to create in favor of the Bank a legal, valid and enforceable Lien on all of the Bank's right, title and interest in and to the Vessel under such Ship Mortgage and the proceeds thereof, and when the Ship Mortgages are filed in the offices specified on <u>Schedule 3.5</u>, the Ship Mortgages shall constitute a Lien on, and security interest in, all right, title and interest of the Bank in such Vessels that are subject of the Ship Mortgage and the proceeds thereof, in each case prior and superior in right to any other Person, other than Permitted Liens.

(b)      Each Vessel is : (i) classified in the highest classification for vessels of the same age and type in the American Bureau of Shipping and is in class without recommendation; (ii) documented in the name of the respective Guarantor, (iii) duly qualified to operate in the coastwise trade of the United States, (iv) eligible to transport cargo between ports in the United States under the Merchant Marine Act of 1920, (v) built in the United States and has been continuously owned and operated by a citizen of the United States, within the meaning of Section 2 of the Shipping Act, (vi) covered by hull, war and protection and indemnity and mortgagee's interest insurance in accordance with the requirements of this Agreement and the Ship Mortgage covering such Vessel, and otherwise satisfactory to the Bank; (vii) endorsed and documented in accordance with applicable legal requirements, including, in the case of new Vessels, filings for all Vessels with the United States Coast Guard, National Vessel Documentation Center, an Application for Documentation, on form CG-1258, satisfactory to Lender and its counsel, seeking documentation of the Vessel in the name of the applicable Loan Party as a vessel of the United States eligible to engage in the coastwise trade, (viii) subject to a valid certificate of inspection issued by the United States Coast Guard, and each such certificate of inspection is in full force and effect without recommendation, (ix) has been issued a Builder's Certification by Builder, on form CG-1261, or if such new Vessel has been previously documented in the name of Builder, is subject to a Bill of Sale, on form CG-1340, satisfactory to Bank, sufficient (when filed with the United States Coast Guard, National Vessel Documentation Center), to vest good title to the New Vessel in the applicable Loan Party, free and clear of all Liens (other than Permitted Liens).

Section 3.6      Judgments, Actions, Proceedings.

There are no outstanding judgments, actions or proceedings at law, in equity or in admiralty, including, without limitation, any Environmental Proceeding, pending before any court or Governmental Authority, bureau, agency, commission, board or instrumentality, with respect to or, to the best of the Borrower's knowledge, threatened against or affecting the Borrower, any Guarantor or any Affiliate, involving a claim in excess of $1,500,000 (which is not fully covered by insurance, subject to deductibles), nor, to the best of the Borrower's knowledge, is there any reasonable basis for the institution of any such action or proceeding that is probable of assertion, nor are there any such actions or proceedings in which either Borrower or any Guarantor is a plaintiff or complainant.

Section 3.7      No Defaults, Compliance With Laws.

Neither Borrower nor any Guarantor nor any Affiliate is in default under any agreement, ordinance, resolution, decree, bond, note, indenture, order or judgment to which it is a party or by which it is bound, or any other agreement or other instrument by which any of the properties or assets owned by it or used in the conduct of its business is affected, nor is it in material breach of any Environmental Laws and Regulations or subject to any Environmental Liability which default, breach or liability could (after considering any insurance proceeds available in respect thereof) have a Material Adverse Effect on the Borrower or any Guarantor.  The Borrower and each Guarantor has complied and is in compliance in all material respects with all applicable laws, ordinances and regulations, resolutions, ordinances, decrees and other similar documents and instruments of all courts and Governmental Authorities, bureaus and agencies, domestic and foreign, including, without limitation, all applicable provisions of the Americans with

Disabilities Act (42 U.S.C. 12101-12213) and the regulations issued thereunder and all applicable Environmental Laws and Regulations, non-compliance with which could have a Material Adverse Effect on the Borrower or any Guarantor.

Section 3.8    Burdensome Documents.

Except as set forth on Schedule 3.8, neither Borrower nor any Guarantor is a party to or bound by, nor are any of the properties or assets owned by either Borrower or any Guarantor used in the conduct of their respective businesses affected by, any agreement, ordinance, resolution, decree, bond, note, indenture, order or judgment, including, without limitation, any of the foregoing relating to any Environmental Liability, that materially and adversely affects their respective businesses, assets or conditions, financial or otherwise.

Section 3.9    Solvency.

Each of the Loan Parties is solvent and is able to pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, and the fair saleable value of each Loan Party's assets, measured on a going concern basis, exceeds all probable liabilities, including those to be incurred pursuant to this Agreement.  None of the Loan Parties has unreasonably small capital in relation to the business in which it is or proposes to be engaged.  None of the Loan Parties has incurred, or believes that it will incur debts beyond its ability to pay such debts as they become due.  In executing the Loan Documents and consummating the transactions contemplated by this Agreement and the other Loan Documents, none of the Loan Parties intends to hinder, delay or defraud either present or future creditors or other Persons to which one or more of the Loan Parties is or will become indebted. On the Closing Date, the foregoing representations and warranties shall be made both before and after giving effect to the transactions contemplated by this Agreement and the other Loan Documents.

Section 3.10    Tax Returns.

Each of the Borrower and each Guarantor has filed all federal, state and local tax returns required to be filed by it and has not failed to pay any taxes, or interest and penalties relating thereto, on or before the due dates thereof.  Except to the extent reserved therefor and for which proper reserves are reflected on the financial statements referred to in Section 3.19 hereof, there are no (a) material federal, state or local tax liabilities of either Borrower due or to become due for any tax year ended on or prior to the date of the Latest Balance Sheet, whether incurred in respect of or measured by the income of such entity, that are not properly reflected in the Latest Balance Sheet, and (b) material claims pending or, to the knowledge of the Borrower, proposed or threatened against either Borrower for past federal, state or local taxes, except those as to which proper reserves are reflected in the financial statements referred to in Section 3.19 hereof.

Section 3.11    Intangible Assets.

The Borrower possesses all patents, trademarks, service marks, trade names, and copyrights, and rights with respect to the foregoing, necessary to conduct their business as now conducted and as proposed to be conducted, without any conflict with the patents, trademarks,

service marks, trade names, and copyrights and rights with respect to the foregoing, of any other Person, and each of such patents, trademarks, service marks, trade names, copyrights and rights with respect thereto, together with any pending applications therefor, are listed on Schedule 3.11.

Section 3.12    Regulation U.

No part of the proceeds received by the Borrower or any Guarantor from the Loans will be used directly or indirectly for: (a) any purpose other than as set forth in Section 2.13, or (b) the purpose of purchasing or carrying, or for payment in full or in part of Indebtedness that was incurred for the purposes of purchasing or carrying, any "margin stock", as such term is defined in Section 221.3 of Regulation U of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II, Part 221.

Section 3.13    Name Changes, Mergers, Acquisitions: Location of Collateral.

(a)    Except as set forth on Schedule 3.13, no Borrower nor any Guarantor has within the six-year period immediately preceding the date of this Agreement changed its name, been the surviving entity of a merger or consolidation, or acquired all or substantially all of the assets of any Person.

(b)    Except as set forth on Schedule 3.13, no Collateral (other than the Vessels) constituting personal property having an aggregate fair market value in excess of $50,000 covered by the Security Documents has, at any time during the four-month period immediately preceding the date hereof, been located anywhere other than: (i) at its location on the date hereof, or (ii) the location referred to in the Security Document covering such Collateral.

Section 3.14    Full Disclosure.

No financial statement, certificate, opinion, or any other statement made or furnished in writing to the Bank by or on behalf of the Borrower or any Guarantor in connection with this Agreement or the transactions contemplated herein, contains any untrue statement of a material fact, or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading, as of the date such statement was made.  There is no fact known to the Borrower that has, or would in the now foreseeable future have, a Material Adverse Effect on the Borrower or any Guarantor, which fact has not been set forth herein, in any financial statements or any certificate, opinion or other written statement so made or furnished to the Bank.

Section 3.15    Licenses and Approvals.

The Borrower has all requisite power and authority and necessary licenses and permits, including, without limitation, all licenses, authorizations and permits arising under or relating to any Environmental Liability, to own and operate its properties, and to carry on its businesses as now conducted.

Section 3.16    Labor   Disputes;   Collective   Bargaining   Agreements:   Employee Grievances.

31

Except as set forth on Schedule 3.16: (a) there are no collective bargaining agreements or other labor contracts covering the Borrower or any Guarantor; (b) no such collective bargaining agreement or other labor contract will expire during the term of this Agreement: (c) to the best of the Borrower's knowledge, no union or other labor organization is seeking to organize, or to be recognized as bargaining representative for, a bargaining unit of employees of the Borrower or any Guarantor; (d) there is no pending or, to the best of the Borrower's knowledge, threatened strike, work stoppage, material unfair labor practice claim or charge, arbitration or other material labor dispute against or affecting the Borrower or any Guarantor or their respective employees; and (e) there are no actions, suits, charges, demands, claims, counterclaims or proceedings pending or, to the best of the Borrower's knowledge, threatened against either Borrower or any Guarantor, by or on behalf of, or with, its employees, other than employee grievances arising in the ordinary course of business that are not, in the aggregate material.

Section 3.17    Condition of Assets.

All of the assets and properties of the Borrower and each Guarantor that are reasonably necessary for the operation of their respective businesses, are in good working condition, ordinary wear and tear excepted, and are able to serve the function for which they are currently being used.

Section 3.18    ERISA.

(a)    Except as set forth on Schedule 3.18, no Employee Benefit Plan is maintained or has ever been maintained by any Loan Party or any ERISA Affiliate, nor has any Loan Party or any ERISA Affiliate ever contributed to a Multiemployer Plan.

(b)    There are no agreements which will provide payments to any officer, employee, shareholder or highly compensated individual which will be "parachute payments" under 280G of the Code that are nondeductible to any Loan Party and which will be subject to tax under Section 4999 of the Code for which any Loan Party will have a material withholding liability.

Section 3.19    Financial Statements.

Each of the Financial Statements is correct and complete and presents fairly the financial position of the Borrower and each other entity to which the Borrower relates, as at its date, and has been prepared in accordance with generally accepted accounting principles.  Neither any Borrower nor any other entity to which any of the Financial Statements relates, has any material obligation, liability or commitment, direct or contingent (including, without limitation, any Environmental Liability), that is not reflected in the Financial Statements or the Pro Forma Balance Sheet.  There has been no material adverse change in the financial position or operations of any Borrower or any other entity to which any of the Financial Statements relates since the date of the latest balance sheet included in the Financial Statements (the "Latest Balance Sheet"). The fiscal year of the Borrower and of its Subsidiaries is the twelve-month period ending on December 31 in each year.

Section 3.20    Compliance with OFAC Rules and Regulations.

(a)     None of the Loan Parties or their Subsidiaries or their respective Affiliates is in violation of and shall not violate any of the country or list based economic and trade sanctions administered and enforced by OFAC that are described or referenced at http://www.ustreas.gov/offices/enforcement/ofac/ or as otherwise published from time to time.

(b)     None of the Loan Parties or their Subsidiaries or their respective Affiliates (i) is a Sanctioned Person or a Sanctioned Entity, (ii) has a more than 10% of its assets located in Sanctioned Entities, or (iii) derives more than 10% of its operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  No proceeds of any Loan will be used nor have any been used to fund any operations in, finance any investments or activities in or make any payments to, a Sanctioned Person or a Sanctioned Entity.

Section 3.21     Anti-Terrorism Laws.

Neither any Credit Party nor any of its Subsidiaries is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 *et seq.*) (the "Trading with the Enemy Act"), as amended.  Neither any Credit Party nor any of its Subsidiaries is in violation of (a) the Trading with the Enemy Act, as amended, (b) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or (c) the Patriot Act.  None of the Credit Parties (i) is a blocked person described in Section 1 of the Anti-Terrorism Order or (ii) to the best of its knowledge, engages in any dealings or transactions, or is otherwise associated, with any such blocked person.

Section 3.22     Compliance with FCPA.

Each of the Loan Parties and their Subsidiaries is in compliance with the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, *et seq.*, and any foreign counterpart thereto.  None of the Loan Parties or their Subsidiaries has made a payment, offering, or promise to pay, or authorized the payment of, money or anything of value (a) in order to assist in obtaining or retaining business for or with, or directing business to, any foreign official, foreign political party, party official or candidate for foreign political office, (b) to a foreign official, foreign political party or party official or any candidate for foreign political office, and (c) with the intent to induce the recipient to misuse his or her official position to direct business wrongfully to such Loan Party or its Subsidiary or to any other Person, in violation of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, *et seq.*

Section 3.23     Investment Company Act, Etc.

Neither the Borrower nor any of its Subsidiaries is (a) an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to registration under, the Investment Company Act of 1940, as amended, or (b) otherwise subject to registration under any other regulatory scheme limiting its ability to incur debt or requiring any approval or consent from or registration or filing with, any Governmental Authority in connection therewith.

Section 3.24    Vessel Qualification.

The Borrower maintains in its possession, or causes each Guarantor to maintain in its possession, a current SMC for each Vessel, a DOC for the operator of each Vessel and  a United States Coast Guard Certificate of Financial Responsibility (Water Pollution) with respect to each Vessel.  Upon reasonable request of the Bank at any time and from time to time, the Borrower shall deliver confirmation to the Bank that each of the foregoing certificates is in force and effect.  Neither the Borrower nor the Guarantors require an ISSC to operate any Vessel for the intended domestic coastal trade of the Vessels.


Article 4.
The Closing: Conditions to the Loan

Section 4.1    The Closing.

The closing with respect to the "initial Loan" to be made hereunder (the "Closing") shall take place on the date (the "Closing Date") of the fulfillment (to the satisfaction of the Bank) of the conditions precedent set forth in Sections 4.2 and 4.3.  Subject to the fulfillment (to the satisfaction of the Bank) of the conditions precedent set forth in Sections 4.2 and 4.3, the Closing shall take place at 10:00 a.m. on the Closing Date at the offices of the Borrower in Melville, New York, or at such other place (or via electronic means) upon which the parties hereto shall agree.

Section 4.2    Conditions to the Initial Loan.

This Agreement shall become effective upon, and the obligation of Bank to make the initial Loans on the Closing Date is subject to, the satisfaction of the following conditions precedent:

(a)    The Borrower shall have executed and delivered to the Bank the Note.

(b)    The Borrower shall (or in the case of (i) and (ii) below the Bank, if it shall so elect, shall) have:

(i)    caused to be duly filed appropriate Uniform Commercial Code financing statements in order to enable the Bank to perfect and preserve its security interest in the Collateral covered by the Security Documents;

(ii)    caused to be delivered to the Bank acknowledgment copies thereof evidencing such filings;

(iii)    delivered to the Bank evidence of the Borrower's liability insurance policies;

(iv)    delivered to the Bank: appraisals with respect to the Vessels, which shall be in form and substance satisfactory to the Bank; and

(v)      otherwise duly complied with all of the terms and conditions of the Security Documents to be executed by it.

(c)      Each of the Guarantors shall have:

(i)      executed and delivered to the Bank its Guaranty of the Obligations hereunder;

(ii)      delivered to the Bank with respect to each Vessel, original summaries of the insurance coverage (or original policies) and certificates of entry evidencing insurance covering such Vessel;

(iii)      executed and delivered to the Bank a Ship Mortgage on each Vessel owned by it and, in connection therewith, each such Vessel shall have been duly documented in the name of such Guarantor under the laws of the United States, each of such Ship Mortgages shall have been duly recorded by the United States Coast Guard (or, in the discretion of the Bank, filed for recording in such office), and each of such Ship Mortgages shall constitute a preferred mortgage on the Vessel to which it relates subject only to other preferred mortgage liens in favor of the Bank;

(iv)      executed and delivered to the Bank the Assignments and, in connection therewith, shall have executed and delivered to the Bank notices of assignment and authorizations to collect insurance claims and to collect general average contributions, in such form and in such number of counterparts as may be reasonably requested by the Bank; and

(v)      otherwise duly complied with all of the terms and conditions of the Security Documents to be executed by it.

(d)      LeClairRyan, a Professional Corporation, counsel to the Borrower and the Guarantors, shall have delivered its opinion to, and in form and substance satisfactory to, the Bank.

(e)      The Bank shall have received the following:

(i)      (A) a true and complete copy of the Certificate of Documentation of each Vessel and (B) a certificate of ownership and encumbrance or a certified copy of the Abstract of Title of such Vessel issued by the United States Coast Guard showing the Guarantor described on Schedule 3.5 as the owner of such Vessel to be the sole owner of each Vessel free and clear of all Liens of record except (x) the Ship Mortgage or Mortgages covering each such Vessel in favor of the Bank and (y) the Liens in favor of Bank of America, N.A. that are being terminated on the closing date in connection with the payoff of all existing indebtedness in favor;

(ii)      with respect to each Vessel if the Bank shall have requested the same in writing, a current classification survey status report from the American Bureau of Shipping;

(iii)      with respect to each Vessel, a copy of the current certificate of inspection issued by the United States Coast Guard covering such Vessel reflecting no outstanding recommendations;

(iv)      (A) written advice from Arthur J. Gallagher Risk Management Associates, Inc., insurance brokers acting for Borrower, of the placement of the insurances covering each Vessel; (B) written confirmation from such brokers, that they have received no notice of the assignment of the insurances or any claim covering each Vessel in favor of any party other than the Bank; (C) an opinion of such brokers to the effect that such insurance complies with the applicable provisions of the Ship Mortgages; and (D) an agreement by such brokers, in form and substance satisfactory to the Bank, whereunder the insurances of each Vessel, and claims thereunder, will not be affected by nonpayment of premiums on any other insurances;

(f)      The Bank shall have received copies of the following:

(i)      All of the consents, approvals and waivers referred to on Schedule 3.2 (except only those which, as stated on Schedule 3.2, shall not be delivered);

(ii)      The certificates of incorporation of the Borrower and the Guarantors, certified by the Secretary of State of their respective states of incorporation;

(iii)      The by-laws of the Borrower and the Guarantors (other than with respect to B No. 245 Co.), certified by their respective secretaries;

(iv)      All corporate action taken by the directors (and, if requested, taken by the shareholders) of the Borrower and the Guarantors to authorize the execution, delivery and performance of each of the Loan Documents to which it is a party and the transactions contemplated thereby, certified by their respective secretaries;

(v)      Good standing certificates and telegrams as of dates not more than ten (10) days prior to the Closing Date, with respect to the Borrower and the Guarantors, from the Secretary of State of their respective states of incorporation and each state in which each of them is qualified to do business; and

(vi)      Incumbency certificates (with specimen signatures) with respect to the Borrower and the Guarantors.

(g)      The Bank shall have received an officer's certificate prepared by the chief financial officer or chief executive officer of the Borrower as to the financial condition, solvency and related matters of the Loan Parties and their Subsidiaries, after giving effect to the transactions contemplated by this Agreement and the other Loan Documents and the initial borrowings under the Loan Documents, in substantially the form of Exhibit D hereto.

(h)      The Bank shall have received a Compliance Certificate executed by a duly authorized officer of the Borrower as of the Closing Date also certifying that each of the other conditions precedent in Section 4.2 have been satisfied, except to the extent the satisfaction of any such condition is subject to the judgment or discretion of the Bank or any Lender.

(i)      All legal matters incident to the execution and delivery of this Agreement and the other Loan Documents shall be satisfactory to counsel to the Bank.

(j)      All the legal and appraisal fees of the Bank in connection with the preparation and/or execution and delivery of this Loan Agreement shall have been paid.

Section 4.3    Conditions to Each Loan.

The obligations of the Bank to make each Loan (including the initial Loan on the Closing Date) shall be subject to the fulfillment (to the satisfaction of the Bank) of the following conditions precedent:

(a)      The Bank shall have received a Borrowing Notice in accordance with subsection 2.1(b).

(b)      The Borrower shall have complied and shall then be in compliance with all of the terms, covenants and conditions of this Agreement;

(c)      After giving effect to the Loan, there shall exist no Default or Event of Default hereunder;

(d)      The representations and warranties contained in Article 3 hereof shall be true and correct on the date hereof;

(e)      The Bank shall have received a Compliance Certificate dated the date of the borrowing certifying, inter alia, that the conditions set forth in this subsection 4.3 are satisfied on such date; and

(f)      All legal matters incident to such Loan shall be satisfactory to counsel for the Bank.

Article 5.
Delivery of Financial Reports, Documents and Other Information.

While the Loans remain outstanding, so long as the Borrower is indebted to the Bank and until payment in full of the Note and full and complete performance of all of their other obligations arising hereunder, the Borrower shall deliver to the Bank:

Section 5.1    Annual Financial Statements.

Annually, as soon as available, but in any event within one hundred fifty (150) days after the last day of each of their fiscal years, (a) a consolidated balance sheet of each of the Borrower and its Subsidiaries as at such a last day of the fiscal year, and consolidated statements of income and retained earnings and statements of cash flow for each, for such fiscal year, and (b) combining balance sheets of each of the Borrower and its Subsidiaries as at such last day of the fiscal year and combining statements of income and retained earnings and statements of cash flow for such year, each prepared in accordance with generally accepted accounting principles consistently applied, in reasonable detail, and certified without qualification by Owen Petersen &

Co. LLP or another firm of independent certified public accountants satisfactory to the Bank, as fairly presenting the financial position and the results of operations of each of the Borrower and its Subsidiaries as at and for the year ending on its date and as having been prepared in accordance with GAAP.

Section 5.2       Quarterly Financial Statements.

As soon as available, but in any event within ninety (90) days after the end of each quarterly fiscal period, (a) a consolidated balance sheet of each of the Borrower and its Subsidiaries as of the last day of such period and consolidated statements of income and retained earnings and statements of cash flow for each, for such period, and combining balance sheets for the Borrower together with its respective subsidiaries, and (b) combining statements of income and retained earnings and statements of cash flow, for such fiscal period and in each case on a comparative basis figures for the corresponding period of the immediately preceding fiscal year, all in reasonable detail, such consolidated statements to be certified on a review basis by the independent certified public accountants referred to in Section 5.1 hereof in each case as accurately presenting the financial position and the results of operations of each of the Borrower and its Subsidiaries as the case may be, as at its date and for such period and as having been prepared in accordance with GAAP (subject to year-end audit adjustments).

Section 5.3       Compliance Information.

(a)       Concurrently with the delivery of the financial statements referred to in Sections 5.1 and 5.2 above, a statement or certificate delivered by the president or chief financial officer of the Borrower, representing that the financial statements were prepared in accordance with Sections 5.1 and 5.2 and providing calculations in reasonable detail to show compliance with Section 6.9 hereof as of the last day of such period.  Upon delivery of such statement or certificate, no Default or Event of Default shall be deemed to exist unless otherwise disclosed by such officer.

(b)       Promptly after a written request therefor, such other financial data or information evidencing compliance with the requirements of this Agreement, the Note and the other Loan Documents, as the Bank may reasonably request from time to time.

Section 5.4       Certificate of Accountants.

At the same time as they deliver the financial statements required under the provisions of Section 5.1, a certificate of the independent certified public accountants of the Borrower addressed specifically to both the Borrower and the Bank to the effect that during the course of their audit of the operations of the Borrower and the Borrower's condition as of the end of the fiscal year, nothing has come to their attention which would indicate that a Default or an Event of Default hereunder has occurred or that there was any violation of the covenants contained in Sections 6.9, Article 7 or Section 8.13 of this Agreement, or, if such cannot be so certified, specifying in reasonable detail the exceptions, if any, to such statement.

Section 5.5       Accountants' Reports.

Promptly upon receipt thereof, copies of all other reports submitted to the Borrower by its independent accountants in connection with any annual or interim audit or review of the books of the Borrower made by such accountants.

Section 5.6    Notices of Defaults.

Promptly, notice of the occurrence of any Default or Event of Default, or any event that would constitute or cause a material adverse change in the condition, financial or otherwise, or the operations of the Borrower or any of the Guarantors.

Section 5.7    ERISA Notices and Requests.

Notice, within ten (10) days after the occurrence of any of the following: (a) the establishment or maintenance by any Loan Party or any ERISA Affiliate, or any Loan Party or ERISA Affiliate becoming liable in respect of, any Employee Benefit Plan or any Multiemployer Plan other than the Plans set forth on Schedule 3.18; (b) the failure by any Loan Party or any ERISA Affiliate to make any required contribution or payment in respect of any Employee Benefit Plan or Multiemployer Plan; and (c) receipt by any Loan Party or ERISA Affiliate of any correspondence with the PBGC, the Secretary of Labor of the United States of America or any representative of the IRS with respect to any Employee Benefit Plan or Multiemployer Plan, relating to an actual or threatened change or development which could have a Materially Adverse Effect on the Borrower, any other Loan Party or any ERISA Affiliate.

Section 5.8    Additional Information.

Such other information regarding the business, affairs and condition of the Borrower and the Guarantors as the Bank may from time to time reasonably request.

Article 6.
Affirmative Covenants.

While the Loans or the commitment of Bank to make Loans hereunder remain outstanding, so long as the Borrower is indebted to the Bank, and until payment in full of the Note and full and complete performance of all of their other obligations arising hereunder and the termination of all commitments of Bank to lend funds hereunder, the Borrower shall and shall cause each Subsidiary and Guarantor to:

Section 6.1    Books and Records.

Keep proper books of record and account in a manner in which full, true and correct entries shall be made of all dealings or transactions in relation to its business and activities.

Section 6.2    Inspections and Audits.

Permit the Bank to make or cause to be made, on reasonable notice and at reasonable times (a) so long as no Event of Default exists, no more than one time in any calendar year, inspections and audits of any books, records and papers of the Borrower and to make extracts therefrom and copies thereof, and (b) (at the Bank's expense prior to the occurrence of a Default

or an Event of Default) inspections and examinations of any properties and facilities of the Borrower and each of the Subsidiaries and Guarantors, in order to assure that the Borrower is and will be in compliance with their obligations under the Loan Documents or to evaluate the Bank's investment in the Note; provided, however, that during the existence of an Event of Default, the Bank may make such inspections, audits and examinations at Borrower's expense as often as the Bank may deem necessary or desirable in its sole discretion.  The information obtained by the Bank in connection with such inspections, audits and examinations shall be subject to the confidentiality provisions set forth in Section 9.16 hereof.

Section 6.3     Compliance with Laws: Maintenance and Repairs.

Comply, in connection with the Borrower's and each of the Subsidiaries' and Guarantors' ownership and operation of its business, with all applicable laws, ordinances, regulations and orders, non-compliance with which could have a Material Adverse Effect; and maintain in good repair, working order and condition, subject to normal wear and tear, all material properties and assets from time to time owned by them and used in or necessary for the operation of their business, and make all reasonable repairs, replacements, additions and improvements thereto.

Section 6.4     Continuance of Business.

Do, or cause to be done, all things reasonably necessary to preserve and keep in full force and effect their corporate existence and all permits, rights and privileges necessary for the proper conduct of their business and continue to engage in the same line of business and comply in all material respects with all applicable laws, regulations and orders.

Section 6.5     Copies of Corporate Documents.

Subject to the prohibitions set forth in Section 7.12, promptly deliver to the Bank copies of any amendments or modifications to their, any Subsidiary's and any Guarantor's certificate of incorporation and by-laws, certified with respect to the certificate of incorporation by the Secretary of State of such corporation's state of incorporation and, with respect to the bylaws, by the secretary or assistant secretary of such corporation.

Section 6.6     Perform Obligations.

Pay and discharge all of their respective obligations and liabilities, including, without limitation, all taxes, assessments and governmental charges upon their income and properties when due, unless and to the extent only that such obligations, liabilities, taxes, assessments and governmental charges shall be contested in good faith and by appropriate proceedings and that, to the extent required by generally accepted accounting principles then in effect, proper and adequate book reserves relating thereto are established by the Borrower and then only to the extent that a bond is filed in cases where the filing of a bond is necessary to avoid the creation of a Lien against any of its properties.

Section 6.7     Notice of Litigation.

Promptly notify the Bank in writing of any litigation, legal proceeding, investigation or dispute, at law, in equity or in admiralty, other than disputes in the ordinary course of business

or, whether or not in the ordinary course of business, (a) involving amounts, either individually or in the aggregate, (i) in excess of One Million Five Hundred Thousand Dollars ($1,500,000), or (ii) that could reasonably be expected to have a Material Adverse Effect, (b) that involves material injunctions or material requests for injunctive relief by or against any Loan Party or any Subsidiary of any Loan Party, (c) affecting or with respect to this Agreement, any other Loan Document or any security interest or Lien created thereunder  or (d) by any Governmental Authority relating to any Loan Party or any Subsidiary thereof and alleging fraud, criminal deception or willful misconduct by such Person that involves potential liability to any Loan Party or any Subsidiary thereof, either individually or in the aggregate, that could reasonably be expected to (i) exceed One Million Five Hundred Thousand Dollars ($1,500,000), or (ii) have a Material Adverse Effect, in each case of subsections (a) through (d) hereof, affecting any Loan Party or any Subsidiary thereof, whether or not fully covered by insurance, and regardless of the subject matter thereof (excluding, however, any actions relating to workers' compensation claims or negligence claims relating to use of motor vehicles or vessels, if fully covered by insurance, subject to deductibles).

Section 6.8    Insurance.

(a)    Maintain with financially sound and reputable insurance companies such insurance on such of its properties and business, and the properties and business of its Subsidiaries, in such amounts and against such risks as is customarily maintained by similar businesses operating in the same or similar locations and all insurance required to be maintained pursuant to the Security Documents, with policy deductibles that shall not exceed that which is customary for companies similarly situated and reasonably acceptable to the Bank, including, without limitation (1) full form hull and war risks insurance, with a stipulated agreed value in an amount not less than the fair market value of such Vessel (but in no event and at no time shall the aggregate hull insurance on all Vessels be in an amount less than the outstanding balance of the Obligations), (2) protection and indemnity insurance, on form SP-23 or equivalent, including, without limitation, coverage for the crew of each Vessel, liability to cargo legal liability and wreck removal, in amounts per occurrence reasonably acceptable to the Bank, (3) pollution liability and clean-up insurance, with limits per occurrence of no less than the limits of liability under the Oil Pollution Act of 1990, 33 U.S.C. §2701, et seq. and the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601, et seq., as each is amended from time to time, (4) excess risks, including excess protection and indemnity, excess cargo liability, excess collision, and excess pollution insurance, in one or more layers, with aggregate limits in excess of primary in amounts reasonably acceptable to the Bank, and (5) such additional insurance or limits as may be reasonably required by the Bank; provided, however, that it is acknowledged and agreed that the Borrower's policies of insurance and the coverages thereunder that are in effect on the Closing Date are acceptable to the Bank.

(b)    File with the Bank upon Bank's request a detailed list, certified by the chief executive officer or chief financial officer of the Borrower, of the insurance then in effect, stating the names of the insurance companies, the amounts and rates of the insurance, the dates of the expiration thereof and the properties and risks covered thereby.

(c)    At all times shall name the Bank as additional insured on all liability insurance policies (other than protection and indemnity coverage) of the Borrower and its

41

Subsidiaries and as loss payee (pursuant to the loss payee endorsement approved by the Bank) on all casualty and property insurance policies of the Borrower and its Subsidiaries (including on all hull and machinery, increased value and other physical loss or damage coverages).

(d)     Ensure that insurance policies pertaining to Vessels provide that (1) there shall be no recourse against the Bank for the payment of premiums, commissions or deductibles, (2) if such policies provide for the payment of club calls, assessments or advances, there shall be no recourse against the Bank for the payment thereof and (3) to the extent obtainable from underwriters or brokers, the Bank will receive at least fourteen (14) days (other than for War Risks insurance, where seven (7) Business Days shall apply) written notice from the insurance company or broker prior to cancellation or any material alteration in the insurance policy or reduction in coverage which could materially affect the interest of the Bank.

(e)     Should any Vessel be navigated outside her customary navigation limits, Borrower shall, prior to any such navigation, procure an endorsement to the policies obtained hereunder authorizing such navigation, and procure increased value, war risk and related coverages as may be reasonably required by the Bank.

(f)     Provide to the Bank, within ten (10) days of the Closing Date, a separate single interest or breach of warranty coverage in an amount at all times equal to or greater than the Obligations, such that no act or omission of Borrower, or any charterer, or breach of any warranty, including breach of any warranty of seaworthiness, whether express or implied, shall operate to forfeit the Bank's coverage under the above policies or result in a cancellation of insurance as to the Bank.

(g)     Should Borrower or any Subsidiary fail to obtain any insurance referred to herein, give the Bank written notice of such fact, endeavor to obtain such insurance and detain such Vessel in port until such insurance has been obtained.

Section 6.9     Financial Covenants.

Have or maintain:

(a)     a Total Leverage Ratio of not greater than 2.75 to 1.00 at Closing, and at the end of each fiscal quarter of the Borrower.

(b)     a combined Tangible Net Worth (that is, the aggregate Tangible Net Worth for the Borrower and its Subsidiaries) equal to Two Hundred Million Dollars ($200,000,000.00) at Closing, and at all times thereafter.

(c)     ownership, legally and beneficially, by Borrower or Affiliates of Borrower of one hundred percent (100%) of the issued and outstanding capital stock of the Affiliates of Borrower whose revenues and tangible net worth comprise not less than eighty percent (80%) of the revenues and tangible net worth used in compiling the Total Leverage Ratio and Tangible Net Worth referred to in (a) and (b) above of this Section 6.9.

Section 6.10     Notice of Certain Events.

(a)    Promptly notify the Bank in writing of any event in respect of any Employee Benefit Plan or any Multiemployer Plan which could have a Material Adverse Effect on any Borrower, any of its Subsidiaries, any other Loan Party or any ERISA Affiliate.

(b)    Promptly notify the Bank in writing if either Borrower, any Subsidiary of either Borrower, or any other Loan Party or Affiliate receives: (i) any notice of any violation or administrative or judicial complaint or order having been filed or about to be filed against such Borrower or such other Loan Party alleging violations of any Environmental Law and Regulation that could reasonably be expected to (x) result in liability, either individually or in the aggregate, in excess of $1,500,000 or (y) have a Material Adverse Effect, or (ii) any notice from any Governmental Authority or any other Person alleging that such Borrower or such other Loan Party is or may be subject to any Environmental Liability that could reasonably be expected to (x) result in liability, either individually or in the aggregate, in excess of $1,500,000 or (y) have a Material Adverse Effect; and promptly upon receipt thereof, provide the Bank with a copy of such notice together with a statement of the action the Borrower or such other Loan Party intends to take with respect thereto.

Section 6.11    ERISA Compliance.

Materially comply with all applicable provisions of ERISA and the Code now or hereafter in effect.

Section 6.12    Environmental Compliance.

Operate all property owned, operated or leased by it in compliance with all Environmental Laws and Regulations, such that no material Environmental Liability arises under any Environmental Laws and Regulations, which could (a) reasonably be expected to have a Material Adverse Effect on any Borrower, any of its Subsidiaries or any other Loan Party or (b) materially adversely affect the value of any Vessel or the validity, priority or enforceability of the Bank's Lien thereon.

Section 6.13    Certain Affirmative Covenants Relating to the Vessels.

(a)    Promptly after the date hereof, cause a certified copy of each Ship Mortgage, together with a notice thereof, to be kept with the certificate of documentation of the Vessel to which it relates, and with respect to each Vessel, shall furnish the Bank with copies of the masters' signed receipts therefor.

(b)    Cause the Vessels to be maintained in the highest classification for vessels of like age and type by the American Bureau of Shipping or any other classification society satisfactory to the Bank.

(c)    Permit the Bank to have the Vessels appraised by qualified appraiser or surveyed by marine engineers or other surveyors, in each case selected by the Bank, in its sole discretion, at such times and with such frequency, but in any event not more than once every year in the case of appraisals and once every three years in the case of surveys, as the Bank may reasonably request; provided, however, that (i) upon the occurrence and continuation of any Event of Default, the Bank may have the Vessels appraised or surveyed at Borrower's expense as

often as it may deem necessary or desirable in its sole discretion and (ii) absent an Event of Default, (A) the Bank shall provide the Borrower with thirty (30) days' notice of an appraisal or survey and (B) such appraisals or surveys shall be conducted at the Bank's expense, unless the Bank deems such appraisals or surveys to be necessary in connection with a request made by the Borrower for (1) additional financing or extensions of credit (whether in connection with this Agreement or otherwise) or (2) the substitution of, replacement of, or addition to Collateral (including, without limitation, pursuant to Section 2.6 and the pledge of Additional Security pursuant to Section 6.16).

Section 6.14    Reserved.

Section 6.15    Approved Additional Financing.   Give the Bank written notice of the terms of any Approved Additional Financing not later than twenty (20) days after the consummation thereof.

Section 6.16    Appraisal Value.

Maintain at all times the Appraisal Value of the Vessels at not less than one hundred seventy-five percent (175%) of the sum of the aggregate outstanding principal amount of the Loans and the Unused Commitment; provided, however, in the event that the Appraisal Value of the Vessels shall be less than one hundred seventy-five percent (175%) of such sum (the difference of such amounts, the "Deficiency"), the Borrower, within ten (10) days after the date on which the Bank shall have notified the Borrower of such event, shall:

(i)      prepay the Loans in an amount equal to the Deficiency; or

(ii)     assign and pledge to the Bank additional security (the "Additional Security") for the payment of the Obligations, such security to be in form, substance and value satisfactory to the Bank; or

(iii)    deposit with the Bank Cash in an amount equal to the difference between the Deficiency and the value of the Additional Security pledged to the Bank pursuant to clause (ii) hereof, to be held by the Bank as cash collateral for the payment of the Obligations, so that the sum of (x) the Appraisal Value of the Vessels, (y) the value (as determined by the Bank) of the Additional Security and (z) the amount of the cash collateral deposited with the Bank pursuant to this Section 6.16 shall be not less than one hundred seventy-five percent (175%) of the sum of the aggregate outstanding principal amount of the Loans and the Unused Commitment; and provided, further, in calculating such Appraisal Value of Vessels an appropriate (in the opinion of the Bank) deduction from any Vessel's Appraisal Value shall be made to compensate for any other indebtedness secured by such Vessel.

Article 7.
Negative Covenants.

While the Loans or the commitment of Bank to make Loans hereunder remain outstanding, so long as the Borrower is indebted to the Bank, and until payment in full of the

Note and full and complete performance of all of their other obligations arising hereunder and the termination of all commitments of Bank to lend funds hereunder, the Borrower shall not and shall not permit any of their Subsidiaries or any Guarantor to do, agree to do, or permit to be done, any of the following:

Section 7.1    Indebtedness.

Create, incur, permit to exist or have outstanding any Indebtedness, except:

(a)    Indebtedness of the Borrower to the Bank under this Agreement and the Note;

(b)    (i) Taxes, assessments and governmental charges (A) not more than 90 days past due from the original due date thereof or (B) more than 90 days past due but not more than 365 days past due from the original due date thereof, so long as such amounts described in this clause (B) shall be contested in good faith by appropriate proceedings and reserves, if applicable, in conformity with GAAP with respect thereto have been provided on the books of the Loan Parties, (ii) non-interest bearing accounts payable (A) not more than 90 days past due from the original due date thereof or (B) more than 90 days past due but not more than 365 days past due from the original due date thereof, so long as such amounts described in this clause (B) shall be contested in good faith by appropriate proceedings and reserves, if applicable, in conformity with GAAP with respect thereto have been provided on the books of the Loan Parties, (iii) accrued liabilities not more than 365 days past due from the original due date thereof and (iv) non-interest bearing deferred liabilities other than for borrowed money (e.g., deferred compensation and deferred taxes), in each case incurred and continuing in the ordinary course of business;

(c)    Indebtedness secured by the security interests referred to in subsection 7.2(b)(iii) and Capitalized Lease Obligations;

(d)    Indebtedness pursuant to the Affiliate Guaranties;

(e)    Intentionally Omitted;

(f)    Intentionally Omitted;

(g)    Indebtedness of Subsidiaries of the Borrower to it incurred as the result of advances by the Borrower to such Subsidiaries of working capital (as such term is defined in Section 2.13 hereof) or for other purposes for which proceeds may be used pursuant to Section 2.13 hereof ("Intercompany Indebtedness");

(h)    Indebtedness outstanding on the Closing Date as set forth on Schedule 7.1;

(i)    Approved Additional Financing; and

(j)    Indebtedness consisting of accrued expenses, deferred income and taxes.

Section 7.2    Liens.

(a)     Create, incur, assume or suffer to exist upon any Vessel, or the earnings or insurances thereof, any Liens whatsoever, except:

(i)     Liens provided for herein or contemplated hereby;

(ii)     Liens for crew's wages or salvage or Liens adequately covered by insurance; and

(iii)     Liens arising out of trade debt incurred in the ordinary course of business none of which shall be outstanding longer than one hundred eighty (180) days, and none of which shall be permitted to have priority over the Liens of the Ship Mortgages.

(b)     Create, or assume or permit to exist, any Lien on any of the properties or assets of the Borrower or the Guarantors other than the Vessels, whether now owned or hereafter acquired, except:

(i)     Those created and granted by the Security Documents;

(ii)     Permitted Liens.

(iii)     Purchase money mortgages or security interests, conditional sale arrangements and other similar security interests, on motor vehicles, aircraft and equipment acquired by the Borrower (hereinafter referred to individually as a "Purchase Money Security Interest") with the proceeds of the Indebtedness referred to in subsection 7.1(c); provided, however, that:

(A)     The transaction in which any Purchase Money Security Interest is proposed to be created is not then prohibited by this Agreement;

(B)     Any Purchase Money Security Interest shall attach only to the property or asset acquired in such transaction and shall not extend to or cover any other assets or properties of the Borrower;

(C)     The Indebtedness secured or covered by any Purchase Money Security Interest shall not exceed the lesser of the cost or fair market value of the property or asset acquired and shall not be renewed, extended or prepaid from the proceeds of any borrowing by the Borrower; and

(D)     The aggregate amount of all Indebtedness secured by Purchase Money Security Interests (in addition to all Additional Approved Financings) shall not at any time exceed Twenty Million Dollars ($20,000,000) at any time outstanding;

(iv)     The interests of the lessor under any Capitalized Lease permitted hereunder;

(v)     Liens securing (i) the intercompany Indebtedness permitted by subsection 7.1(g) as set forth in such subsections, and/or (ii) Approved Additional Financing permitted by the terms hereof; and

(vi)     As set forth on Schedule 7.2.

Section 7.3     <u>Guaranties</u>.

Except for the Affiliate Guaranties and as set forth on Schedule 7.1, assume, endorse, be or become liable for, or guarantee, the obligations of any Person, except by the endorsement of negotiable instruments for deposit or collection in the ordinary course of business.  For the purposes hereof, the term "guarantee" shall include any agreement, whether such agreement is on a contingency or otherwise, to purchase, repurchase or otherwise acquire Indebtedness of any other Person, or to purchase, sell or lease, as lessee or lessor, property or services, in any such case primarily for the purpose of enabling another person to make payment of Indebtedness, or to make any payment (whether as an advance, capital contribution, purchase of an equity interest or otherwise) to assure a minimum equity, asset base, working capital or other balance sheet or financial condition, in connection with the Indebtedness of another Person, or to supply funds to or in any manner invest in another Person in connection with such Person's Indebtedness.

Section 7.4     <u>Mergers, Acquisitions</u>.

Merge or consolidate with any Person (whether or not a Borrower is the surviving entity), or, except as consented to in writing by the Bank (which consent shall not be unreasonably withheld), acquire any vessel or acquire all or substantially all of the assets or any of the capital stock of any Person, other than, so long as no Default or Event of Default exists or would result therefrom, in connection with an Approved Additional Financing; <u>provided</u>, that if the Borrower is a party to such an acquisition in connection with an Approved Additional Financing, the Borrower shall be the surviving entity, and if any other Loan Party (other than the Borrower) is a party to such an acquisition in connection with an Approved Additional Financing, such Loan Party will be the surviving entity.

Section 7.5     <u>Reserved</u>.

Section 7.6     <u>Stock Issuance</u>.

Issue any additional shares or any right or option to acquire any shares, or any security convertible into any shares, of the capital stock of the Borrower or any Guarantor, except (a) in connection with stock dividends as permitted under subsection 7.5(b) and (b) Borrower shall be permitted to issue up to 20% of its capital stock, on a fully diluted basis as of the date hereof, to members of its senior management (other than Morton S. Bouchard, III).

Section 7.7     <u>Change in Business</u>.

Make any material change in its business, or in the nature of its operation, or liquidate or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of any of its property, assets or business except in the ordinary course of business and for a fair consideration, or dispose of any shares of stock or any Indebtedness,

whether now owned or hereafter acquired, or discount, sell, pledge, hypothecate or otherwise dispose of accounts receivable, or permit the conveyance, sale, lease, assignment, transfer or disposal of any Vessel or any change in the flag of any Vessel.

Section 7.8    Prepayments.

Make any voluntary or optional prepayment of any Indebtedness for borrowed money incurred or permitted to exist under the terms of this Agreement, other than Indebtedness evidenced by the Note or otherwise owed to the Bank or any of its Affiliates under an agreement which by its terms permits such voluntary or optional prepayment or in connection with any Additional Approved Financing.

Section 7.9    Investments.

Make, or suffer to exist, any Investment in any Person, including, without limitation, any Affiliate, shareholder, director, officer or employee of either Borrower or any of the Guarantors, except:

(a)    Investments in:

(i)    obligations issued or guaranteed by the United States of America;

(ii)    certificates of deposit, bankers acceptances and other "money market instruments" issued by any bank or trust company organized under the laws of the United States of America or any State thereof and having capital and surplus in an aggregate amount of not less than $500,000,000;

(iii)    open market commercial paper bearing the highest credit rating issued by Standard & Poor's Corporation or by another nationally recognized credit rating agency;

(iv)    repurchase agreements entered into with any bank or trust company organized under the laws of the United States of America or any State thereof and having capital and surplus in an aggregate amount of not less than $500,000,000 relating to United States of America government obligations; and

(v)    shares of "money market funds", each having net assets of not less than $500,000,000; in each case maturing or being due or payable in full not more than 180 days after the Borrower's acquisition thereof;

(b)    Investments by the Borrower in any Subsidiary thereof if, and only if: (i) at the time of such Investment and after giving effect thereto, no Event of Default shall exist hereunder, and (ii) such Investments arc used for the purpose of constructing new double hulled barges or new tugs or retrofitting to double hulls existing vessels;

(c)    Provided that no Default or Event of Default shall have occurred and be continuing or would result therefrom, Investments in the form of loans to shareholders of the Borrower and its Subsidiaries (the "Affiliated Group"), provided that: (1) the outstanding

principal amount of all such loans to all such shareholders which are made for purposes other than those described in sub-sections (c)(2) and (c)(3) herein shall not exceed Twenty Million Dollars ($20,000,000.00) in the aggregate, (2) notwithstanding the provisions described in subsection (c)(1) herein, there shall for the purposes of this proviso be permitted loans to members of the Affiliated Group which are not Guarantors for either of the following purposes: (i) to pay all or any portion of the purchase price of any new vessels which are owned by such member or members, or (ii) to capitalize any new corporations which are wholly owned by such member or members, and (3) notwithstanding the provision described in sub-section (b)(1) hereof, there shall be permitted without limit on the aggregate amount thereof loans used to pay the premiums owing on any life and/or disability insurance policies on Morton S. Bouchard, Ill, and/or any members of his immediate families.  Notwithstanding the foregoing provisions of this subsection 7.9(b) and in addition to the Investments in the form of Loans to the Affiliated Group permitted by the foregoing sentence, Investments by members of the Affiliated Group in the form of loans to shareholders of Borrower the proceeds of which were used to capitalize members of the Affiliated Group purchasing double hulled vessels and/or tugs shall not be deemed to be in violation of this subsection 7.9(c) provided, however, that no Investment permitted by the terms of the foregoing sentence, nor permitted by subclause (2) of this clause (b), shall be deemed so permitted if the obligor to whom any such loan is made or the entity in which any such Investment is made shall incur any Indebtedness to, or suffer to exist any Lien on its property in favor of, any bank or financial institution, which indebtedness is not permitted pursuant to Section 7.1 hereof;

(d)      Intercompany Indebtedness permitted under Subsection 7.1(g) hereof; and

(e)      any advance, loan or extension of credit to any employee of any Loan Party made in the ordinary course of the Loan Parties' business, so long as all such advances and loans from all Loan Parties do not exceed $500,000 at any time outstanding.

Section 7.10   Fiscal Year.

Change its fiscal year.

Section 7.11   ERISA Obligations.

(a)      Establish, or permit any Loan Party or ERISA Affiliate to establish, maintain, operate or participate in any Employee Benefit Plan or Multiemployer Plan other than as set forth on Schedule 3.18; or

(b)      Fail, or permit any Loan Party or ERISA Affiliate to fail, to make any contribution or payment to any Employee Benefit Plan or Multiemployer Plan, required to be made by it the result of which could result in a Material Adverse Effect on the Borrower or any other Loan Party or any ERISA Affiliate; or

(c)      Fail, or permit any Loan Party or ERISA Affiliate to fail, to establish, maintain and operate each Employee Benefit Plan in compliance in all material respects with the provisions of ERISA, the Code and all other applicable laws and the regulations and interpretations thereof.

Section 7.12 <u>Amendments of Documents</u>.

Modify, amend, supplement or terminate, or agree to modify, amend, supplement or terminate, its certificate of incorporation or by-laws or the certificate of incorporation or by-laws of any Guarantor.

Section 7.13 <u>Reserved</u>.

Section 7.14 <u>Reserved</u>.

Section 7.15 <u>Use of Cash</u>.

Use, or permit to be used, in any manner or to any extent, any of the Borrower's Cash for the benefit of any Person, except: (a) in connection with the payment or prepayment of expenses (other than capital expenditures) directly incurred for the benefit of the Borrower and its Subsidiaries in the maintenance and operation of their business, in each case only in the ordinary course of its business, (b) for capital expenditures, (c) for the payment (but not prepayment, except to the extent permitted by this Agreement) of scheduled required payments of principal and interest on Indebtedness of the Borrower permitted to exist hereunder, (d) so long as no Default or Event of Default exists or would exist after giving effect thereto, distributions to Borrower's shareholders, and (e) for uses that are otherwise specifically permitted by this Agreement.

Section 7.16 <u>Hedging Transactions</u>.

Unless otherwise agreed to by the Bank, enter into any hedging transactions (including, without limitation, rate swap transactions, credit derivative transactions, commodity contracts, collar transactions and all transactions and related confirmations subject to any form of master agreement); <u>provided</u>, that in the event any such transaction shall be permitted under this Agreement, the net obligations under any such transaction shall be included in the calculation of the Loan Parties' Indebtedness for all purposes under this Agreement.

Section 7.17 <u>Transactions with Affiliates</u>.

Except as expressly permitted by this Agreement, directly or indirectly: (a) make any Investment in an Affiliate: (b) transfer, sell, lease, assign or otherwise dispose of any assets to an Affiliate; (c) merge into or consolidate with or purchase or acquire assets from an Affiliate; or (d) enter into any other transaction directly or indirectly with or for the benefit of any Affiliate (including, without limitation, guarantees and assumptions of obligations of an Affiliate) provided, however, that: (i) payments on Investments expressly permitted by Section 7.9 hereof may be made, (ii) any Affiliate who is a natural person may serve as an employee or director of the Borrower and receive reasonable compensation for his services in such capacity, and (iii) the Borrower may enter into any transaction with an Affiliate providing for the leasing of property, the rendering or receipt of services or the purchase or sale of product, inventory and other assets in the ordinary course of business if the monetary or business consideration arising therefrom would be substantially as advantageous to the Borrower as the monetary or business consideration that would obtain in a comparable arm's length transaction with a Person not an Affiliate.

Section 7.18    Hazardous Material.

(a)    Cause or permit any Hazardous Material or oil (as defined under OPA) to be used, stored, treated, transported, Discharged or disposed of in violation of any applicable Environmental Laws and Regulations such that an Environmental Liability could arise under any Environmental Laws and Regulations which could (i) have a Material Adverse Effect on the Borrower or any other Loan Party or (ii) materially adversely affect the value of any Vessel or the validity, priority or enforceability of the Bank's Lien thereon.

(b)    The Borrower acknowledges and agrees that the Bank shall have no liability or responsibility for either:

(i)    damage, loss or injury to human health, the environment or natural resources caused by the presence, disposal, Release, threatened Release, Discharge or threat of Discharge of Hazardous Materials or oil (as defined under OPA); or

(ii)    abatement, removal and/or clean-up required under any applicable Environmental Laws and Regulations for a Release, threatened Release, Discharge, threat of Discharge or disposal of any Hazardous Materials or oil (as defined under OPA) transported by or used by or in connection with the Borrower's or any Subsidiary's or any Guarantor's business.

Section 7.19    Certain Negative Covenants Relating to the Vessels.

Do any act or voluntarily suffer or permit any act to be done whereby any insurance required hereunder or under any of the Ship Mortgages shall or may be suspended, impaired or defeated, or suffer or permit any Vessel to engage in any voyage or carry any cargo not permitted under the policies of insurance then in effect covering such Vessel.

Article 8.
Events of Default

If any one or more of the following events ("Events of Default") shall occur and be continuing, the entire unpaid balance of the principal of and interest on the Note outstanding and all other obligations and Indebtedness of the Borrower to the Bank arising hereunder and under the other Loan Documents shall immediately become due and payable upon written notice to that effect given to the Borrower by the Bank (except that in the case of the occurrence of any Event of Default described in Section 8.6 no such notice shall be required and all such amounts shall thereupon automatically become immediately due and payable), without presentment or demand for payment, notice of non-payment, protest or further notice or demand of any kind, all of which are expressly waived by the Borrower:

Section 8.1    Payments.

Failure to make any payment or mandatory prepayment of principal or interest upon the Note within five (5) days after the date when due; or

Section 8.2    Certain Covenants.

(a)     Failure to perform or observe any of the covenants or other agreements contained in Sections 6.4, 6.9 or Article 7 hereof; or

(b)     The occurrence of an Event of Default under and as defined in any of the Ship Mortgages; or

Section 8.3     <u>Other Covenants</u>.

(a)     Failure by any Borrower to perform or observe any of the covenants or other agreements contained in Sections 5.1, 5.2 or 5.6 hereof, which shall remain unremedied for a period (after notice thereof shall have been given to the Borrower by the Bank) of ten (10) days; or

(b)     Failure by any Borrower to perform or observe any other term, condition or covenant of this Agreement or of any of the other Loan Documents to which it is a party, which shall remain unremedied for a period (after notice thereof shall have been given to the Borrower by the Bank) of thirty (30) days; provided, however, that in the event such Borrower shall have made a diligent effort to cure such default and such default shall not be susceptible of a cure within such 30-day period, then no Event of Default shall be deemed to have occurred hereunder until the expiration of 60 days from the date of notice from the Bank to such Borrower with respect thereto so long as such Borrower continues diligently and in good faith (as determined by the Bank in its sole discretion) to attempt to cure such default; or

(c)     Failure by any Loan Party other than the Borrower to perform or observe any term, condition or covenant of any of the Loan Documents (other than the Ship Mortgages) to which it is a party, which shall remain unremedied for a period of thirty (30) days after notice thereof shall have been given to the Borrower by the Bank; or

Section 8.4     <u>Other Defaults</u>.

(a)     Failure to perform or observe any term, condition or covenant of any bond, note, debenture, loan agreement, indenture, guaranty, trust agreement, mortgage or similar instrument to which Borrower is a party or by which it is bound, or by which any of its properties or assets may be affected (each, a "Debt Instrument"), so that, as a result of any such failure to perform, the Indebtedness included therein or secured or covered thereby may be declared due and payable prior to the date on which such Indebtedness would otherwise become due and payable; or

(b)     Any event or condition referred to in any Debt Instrument shall occur or fail to occur, so that, as a result thereof, the Indebtedness included therein or secured or covered thereby may be declared due and payable prior to the date on which such Indebtedness would otherwise become due and payable; or

(c)     Failure to pay any Indebtedness for borrowed money due at final maturity or pursuant to demand under any Debt Instrument; or

Section 8.5     <u>Representations and Warranties</u>.

Any representation or warranty made in writing to the Bank in any of the Loan Documents or in connection with the making of the Loan, or any certificate, statement or report made or delivered in compliance with this Agreement, shall have been false or misleading in any material respect when made or delivered; or

Section 8.6     Bankruptcy.

(a)     Any Borrower or any Guarantor shall make an assignment for the benefit of creditors, file a petition in bankruptcy, be adjudicated insolvent, petition or apply to any tribunal for the appointment of a receiver, custodian, or any trustee for it or a substantial part of its assets, or shall commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or any Borrower or any Guarantor shall take any corporate action to authorize any of the foregoing actions; or there shall have been filed any such petition or application, or any such proceeding shall have been commenced against it, that remains undismissed for a period of thirty (30) days or more; or any order for relief shall be entered in any such proceeding; or any Borrower or any Guarantor by any act or omission shall indicate its consent to, approval of or acquiescence in any such petition, application or proceeding or the appointment of a custodian, receiver or any trustee for it or any substantial part of any of its properties, or shall suffer any custodianship, receivership or trusteeship to continue undischarged for a period of thirty (30) days or more; or

(b)     Any Borrower or any Guarantor shall generally not pay its debts as such debts become due: or

(c)     Any Borrower or any Guarantor shall have concealed, removed, or permitted to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them or made or suffered a transfer of any of its property that may be fraudulent under any bankruptcy, fraudulent conveyance or similar law; or shall have made any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or shall have suffered or permitted, while insolvent, any creditor to obtain a Lien upon any of its property through legal proceedings or distraint that is not vacated within thirty (30) days from the date thereof; or

Section 8.7     Judgments.

Any judgment against any Borrower or any Guarantor or Subsidiary of any Borrower or any attachment, levy or execution against any of their respective properties (other than the Vessels) for any amount in excess of $1,500,000 shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of sixty (60) days or more unless such judgment is fully covered by insurance as to which the insurance company has acknowledged its obligation to pay such judgment in full; or

Section 8.8     ERISA.

(a)     The termination of any Employee Benefit Plan or Multiemployer Plan or the institution by the PBGC of proceedings for the involuntary termination of any Employee

Benefit Plan or Multiemployer Plan, in either case, by reason of, or that results or could result in, a "material accumulated funding deficiency" under Section 412 of the Code; or

(b)     Failure by any Borrower or any Guarantor to make required contributions, in accordance with the applicable provisions of ERISA, to each of the Employee Benefit Plans or Multiemployer Plans hereafter established or assumed by it; or

Section 8.9    Ownership of Stock.

Morton S. Bouchard, III, members of his immediate family and trusts established for the benefit of his immediate family shall at any time own, beneficially and of record, directly or indirectly, less than 80% in the aggregate of all of the issued and outstanding shares of capital stock of the Borrower and each of its Subsidiaries, having ordinary voting rights for the election of directors; or

Section 8.10    Management.

Morton S. Bouchard, III, shall cease for any reason whatsoever, including, without limitation, death or disability (as such disability shall be determined in the sole and absolute judgment of the Bank) to be and continuously perform the duties of chief executive officer and chief operating officer, respectively, of the Borrower or, if such cessation shall occur as a result of the death or such disability, no successor satisfactory to the Bank, in its sole discretion, shall have become and shall have commenced to perform the duties of chief executive officer and chief operating officer, as the case may be, of any Borrower within one hundred eighty (180) days after such cessation; provided, however, that if any satisfactory successor shall have been so elected and shall have commenced performance of such duties within such period, the name of such successor or successors shall be deemed to have been inserted in place of Morton S. Bouchard, III, as applicable, in this Section 8.10 and provided, further, that the Bank hereby acknowledges and agrees that the following is and shall remain satisfactory to the Bank: in the event of the death or incapacity of Morton S. Bouchard, the Trustees of the Morton S. Bouchard Revocable Trust u/a/d July 10, 1999 (who are currently intended to be his wife, Ms. Linda Lee Bouchard and Mr. Michael Gawyrch) will have complete authority to exercise the voting rights over the shares of stock in the Borrower; or

Section 8.11    Liens.

Any of the Liens created and granted to the Bank under the Security Documents shall fail to be valid, first (except where the Bank is otherwise the holder of the first), perfected Liens, subject to no prior or equal Lien, except as permitted by Section 7.2; or

Section 8.12    The Vessels.

(a)     A proceeding shall have been commenced on behalf of the United States of America to effect the forfeiture of any of the Vessels or any notice shall have been issued on behalf of the United States of America of the seizure of any of the Vessels or to the effect that the Certificate of Documentation of any of the Vessels is subject to cancellation or revocation, for any reason whatsoever and the Borrower shall have failed within thirty (30) days of the occurrence thereof to have assigned and pledged to the Bank, or cause to have assigned and

pledged to the Bank, additional collateral having an aggregate value (as determined by the Bank in its sole discretion) at least equal to the agreed value (as set forth on Schedule 3.5) of such Vessel or Vessels in accordance with Section 2.5; or

(b)  Any Borrower or any Guarantor shall lose its status as a citizen of the United States of America for the purpose of operating vessels in the coastwise trade in accordance with Section 2 of the Shipping Act.

At any time while an Event of Default shall be continuing, the Bank may declare, by notice to the Borrower, the Commitment terminated at once and the Notes hereunder to be forthwith due and payable, whereupon the Commitment shall be terminated and the principal amount of the Notes, together with accrued interest thereon and all other amounts owing under this Agreement, shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived, anything contained herein or in such Note to the contrary notwithstanding, and the Bank shall be entitled to exercise such other rights and remedies as provided under the Loan Documents and under applicable law; provided, however, that if any Event of Default of the type specified in Section 8.6 above shall occur then such termination of the Commitment and acceleration of the Notes shall occur automatically upon the happening of such event without the necessity of any such declaration.

Article 9.
Miscellaneous Provisions

Section 9.1    Fees and Expenses; Indemnity.

The Borrower will promptly pay all reasonable costs of the Bank in preparing the Loan Documents and any amendments, modifications or waivers of the provisions thereof and all costs and expenses of the issue of the Note (including, without limitation, reasonable fees of counsel to the Bank and the disbursements of counsel in respect of the Closing) and of the Borrower's and the other Loan Parties' performance of and compliance with all agreements and conditions contained herein on its part to be performed or complied with (including, without limitation, all costs of filing or recording any assignments, mortgages, financing statements and other documents and all appraisal and environmental review fees and expenses (except as otherwise expressly provided for herein)), and the reasonable fees and expenses and disbursements of counsel to the Bank in connection with the administration, interpretation and enforcement of this Agreement, the other Loan Documents and all other agreements, instruments and documents relating to this transaction, the consummation of the transactions contemplated by all such documents, the preservation of all rights of the Bank, the negotiation, preparation, execution and delivery of any amendment, modification or supplement of or to, or any consent or waiver under, any such document (or any such instrument that is proposed but not executed and delivered) and with any claim or action threatened, made or brought against the Bank arising out of or relating to any extent to this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby.   In addition, the Borrower will promptly pay all costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) suffered or incurred by the Bank in connection with its enforcement of the payment of the Note or any other sum due to it under this Agreement or any of the other Loan Documents or any of its other rights hereunder or thereunder.   In addition to the foregoing, the Borrower shall indemnify the Bank

55

and each of its directors, officers, employees, attorneys, agents and Affiliates against, and hold each of them harmless from, any loss, liabilities, damages, claims, costs and expenses (including reasonable attorneys' fees and disbursements) suffered or incurred by any of them arising out of, resulting from or in any manner connected with, the execution, delivery and performance of each of the Loan Documents, the Loans and any and all transactions related to or consummated in connection with the Loans, including, without limitation, losses, liabilities, damages, claims, costs and expenses suffered or incurred by the Bank or any of its directors, officers, employees, attorneys, agents or Affiliates arising out of or related to any Environmental Liability or Environmental Proceeding, or in investigating, preparing for, defending against, or providing evidence, producing documents or taking any other action in respect of any commenced or threatened litigation, administrative proceeding or investigation under any federal securities law or any other statute of any jurisdiction, or any regulation, or at common law or otherwise against the Bank or any of its officers, directors, affiliates, agents or Affiliates.  The indemnity set forth herein shall be in addition to any other obligations or liabilities of the Borrower to the Bank hereunder or at common law or otherwise.  The provisions of this Section 9.1 shall survive the payment of the Note and the termination of this Agreement.

Section 9.2     Taxes.

If, under any law in effect on the Closing Date, or under any retroactive provision of any law subsequently enacted, it shall be determined that any federal, state or local tax is payable in respect of the issuance of the Note, or in connection with the filing or recording of any assignments, mortgages, financing statements, or other documents (whether measured by the amount of Indebtedness secured or otherwise) as contemplated by this Agreement, then the Borrower will pay any such tax and all interest and penalties, if any, and will indemnify the Bank against and save it harmless from any loss or damage resulting from or arising out of the nonpayment or delay in payment of any such tax.  If any such tax or taxes shall be assessed or levied against the Bank or any other holder of any Note, the Bank, or such other holder, as the case may be, may notify the Borrower and make immediate payment thereof, together with interest or penalties in connection therewith, and shall thereupon be entitled to and shall receive immediate reimbursement therefor from the Borrower.  Notwithstanding any other provision contained in this Agreement, the covenants and agreements of the Borrower in this Section 9.2 shall survive payment of any Note and the termination of this Agreement.

Section 9.3     Payments.

As set forth in Article 2 hereof, all payments by the Borrower on account of principal, interest, fees and other charges (including any indemnities) shall be made to the Bank at the Payment Office of the Bank, in lawful money of the United States of America in immediately available funds, by wire transfer or otherwise, not later than 4:00 p.m. New York City time on the date such payment is due.  Any such payment made on such date but after such time shall, if the amount paid bears interest, be deemed to have been made on, and interest shall continue to accrue and be payable thereon until, the next succeeding Business Day.  If any payment of principal or interest becomes due on a day other than a Business Day, such payment may be made on the next succeeding Business Day and such extension shall be included in computing interest in connection with such payment.  All payments hereunder and under any Note shall be made without set-off or counterclaim and in such amounts as may be necessary in order that all

such payments shall not be less than the amounts otherwise specified to be paid under this Agreement and such Note (after withholding for or on account of: (i) any present or future taxes, levies, imposts, duties or other similar charges of whatever nature imposed by any government or any political subdivision or taxing authority thereof, other than any tax (except those referred to in clause (ii) below) on or measured by the net income of the Bank to which any such payment is due pursuant to applicable federal, state and local income tax laws, and (ii) deduction of amounts equal to the taxes on or measured by the net income of the Bank payable by the Bank with respect to the amount by which the payments required to be made under this sentence exceed the amounts otherwise specified to be paid in this Agreement and the Note).  Upon payment in full of any Note, the Bank shall mark the Note "Paid" and return it to the Borrower.

Section 9.4 <u>Survival of Agreements and Representations; Construction</u>.

All agreements, representations and warranties made herein shall survive the delivery of this Agreement and the Notes.  The headings used in this Agreement and the table of contents are for convenience only and shall not be deemed to constitute a part hereof.  All uses herein of the masculine gender or of singular or plural terms shall be deemed to include uses of the feminine or neuter gender, or plural or singular terms, as the context may require.

Section 9.5 <u>Lien on and Set-off of Deposits</u>.

As security for the due payment and performance of all the Obligations, the Borrower hereby grants to the Bank a Lien on any and all deposits or other sums at any time credited by or due from the Bank to the Borrower, whether in regular or special depository accounts or otherwise, and any and all monies, securities and other property of the Borrower, and the proceeds thereof, now or hereafter held or received by or in transit to the Bank from or for the Borrower, whether for safekeeping, custody, pledge, transmission, collection or otherwise, and any such deposits, sums, monies, securities and other property, may at any time after the occurrence and during the continuance of any Event of Default be set-off, appropriated and applied by the Bank against any of the Obligations, whether or not any of such Obligations is then due or is secured by any collateral, or, if it is so secured, whether or not the collateral held by the Bank is considered to be adequate.

Section 9.6 <u>Modifications, Consents and Waivers; Entire Agreement</u>.

No modification, amendment or waiver of or with respect to any provision of this Agreement, any Note, the Security Documents, or any of the other Loan Documents and all other agreements, instruments and documents delivered pursuant hereto or thereto, nor consent to any departure by the Borrower from any of the terms or conditions thereof, shall in any event be effective unless it shall be in writing and signed by the Bank.  Any such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No consent to or demand on the Borrower in any case shall, of itself, entitle them to any other or further notice or demand in similar or other circumstances.   This Agreement and the other Loan Documents embody the entire agreement and understanding between the Bank and the Borrower and supersede all prior agreements and understandings, whether written or oral, relating to the subject matter hereof and no party hereto is relying on any promise, agreement or undertaking not set forth in this Agreement.

Section 9.7     Remedies Cumulative; Counterclaims.

Each and every right granted to the Bank hereunder or under any other document delivered hereunder or in connection herewith, or allowed it by law, equity or admiralty, shall be cumulative and may be exercised from time to time.  No failure on the part of the Bank or the holder of any Note to exercise, and no delay in exercising, any right shall operate as a waiver thereof, nor shall any single or partial exercise of any right preclude any other or future exercise thereof or the exercise of any other right.  The due payment and performance of the Obligations shall be without regard to any counterclaim, right of offset or any other claim whatsoever that the Borrower may have against any Bank and without regard to any other obligation of any nature whatsoever that the Bank may have to the Borrower, and no such counterclaim or offset shall be asserted by the Borrower (unless such counterclaim or offset would, under applicable law, be permanently and irrevocably lost if not brought in such action) in any action, suit or proceeding instituted by the Bank for payment or performance of the Obligations.

Section 9.8     Further Assurances.

At any time and from time to time, upon the request of the Bank, the Borrower shall execute, deliver and acknowledge or cause to be executed, delivered and acknowledged, such further documents, instruments and assurances and do such other acts and things as the Bank may reasonably request in order to fully effect the purposes of this Agreement, the other Loan Documents and any other agreements, instruments and documents delivered pursuant hereto or in connection with the Loans, including, without limitation, the execution and delivery to the Bank of mortgages in form and substance satisfactory to the Bank covering all property or interests therein acquired by the Borrower, and all leases of property entered into by the Borrower as tenant or lessee, after the date of this Agreement, promptly after such acquisition or the entering into of any such lease.  Upon receipt of an affidavit of an officer of Bank as to the loss, theft, destruction or mutilation of any Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of such Note or other security document, Borrower will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

Section 9.9     Notices.

All notices, requests, reports and other communications pursuant to this Agreement shall be in writing, either by letter (delivered by hand or commercial messenger service or sent by certified mail, return receipt requested, except for routine reports delivered in compliance with Article S which may be sent by ordinary first-class mail) or telegram or telecopy, addressed as follows:

(a)     If to the Borrower:

c/o Bouchard Transportation Co., Inc.
58 S. Service Drive
Suite 150
Melville, New York 11747
Attention: Mr. Morton S. Bouchard, III

Telecopier No.: (631) 390-4955

with a copy to:

Stephen I. Siller, Esq.
LeClairRyan, A Professional Corporation
885 Third Avenue — 16th Floor
New York, New York 10022
Telecopier No.: (212) 430-8065

    (b)    If to the Bank:

Wells Fargo Bank, National Association
58 S. Service Road, Suite 100
Melville, NY  11747
Attention: Edward P. Nallan, Jr.
Telecopier No.: 516-577-8333

with a copy (other than in the case of Borrowing Notices, Conversion Notices and reports and other documents delivered in compliance with Article 5 hereof) to:

King & Spalding LLP
100 N. Tryon St.
Charlotte, North Carolina
Attention: Justin Riess
Telecopier No.: (704) 503-2622

Any notice, request, demand or other communication hereunder shall be deemed to have been given on: (x) the day on which it is telecopied to such party at its telecopier number specified above (provided such notice shall be effective only if followed by one of the other methods of delivery set forth herein) or delivered by receipted hand or such commercial messenger service to such party at its address specified above, or (y) on the third Business Day after the day deposited in the mail, postage prepaid, if sent by mail, or (z) on the day it is delivered to the telegraph company, addressed as aforesaid, if sent by telegraph.  Any party hereto may change the Person, address or telecopier number to whom or which notices are to be given hereunder, by notice duly given hereunder; provided, however, that any such notice shall be deemed to have been given hereunder only when actually received by the party to which it is addressed.

    Section 9.10   Counterparts,

    This Agreement may be signed in any number of counterparts with the same effect as if the signatures thereto and hereto were upon the same instrument.

    Section 9.11   Severability.

The provisions of this Agreement are severable, and if any clause or provision hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision in this Agreement in any jurisdiction.  Each of the covenants, agreements and conditions contained in this Agreement is independent and compliance by the Borrower with any of them shall not excuse non-compliance by the Borrower with any other.   All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

Section 9.12    Binding Effect; No Assignment or Delegation by Borrower.

This Agreement shall be binding upon and inure to the benefit of the Borrower and its successors and to the benefit of the Bank and its successors and assigns.   The rights and obligations of the Borrower under this Agreement shall not be assigned or delegated without the prior written consent of the Bank, and any purported assignment or delegation without such consent shall be void.

Section 9.13    GOVERNING LAW; CONSENT TO JURISDICTION: WAIVER OF TRIAL BY JURY.

(a)    THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL OTHER DOCUMENTS AND INSTRUMENTS EXECUTED AND DELIVERED IN CONNECTION HEREWITH AND THEREWITH (OTHER THAN THE SHIP MORTGAGES), SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS RULES PERTAINING TO CONFLICTS OF LAWS.

(b)    THE BORROWER IRREVOCABLY CONSENTS THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT UNDER, ARISING OUT OF OR IN ANY MANNER RELATING TO THIS AGREEMENT, AND EACH OTHER LOAN DOCUMENT MAY BE BROUGHT IN ANY COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY JURISDICTION WHERE A VESSEL MAY BE FOUND.  THE BORROWER, BY THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXPRESSLY AND IRREVOCABLY ASSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF ANY OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING. THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF ANY COMPLAINT, SUMMONS, NOTICE OR OTHER PROCESS RELATING TO ANY SUCH ACTION OR PROCEEDING BY DELIVERY THEREOF TO IT BY HAND OR BY MAIL IN THE MANNER PROVIDED FOR IN SECTION 9.9.   THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES ANY CLAIM OR DEFENSE IN ANY SUCH ACTION OR PROCEEDING BASED ON ANY ALLEGED LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS OR ANY SIMILAR BASIS.   NOTHING IN THIS SECTION 9.13 SHALL AFFECT OR IMPAIR IN ANY

MANNER OR TO ANY EXTENT THE RIGHT OF THE BANK TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST SUCH BORROWER IN ANY JURISDICTION OR TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW.

(c)     EACH OF THE BORROWER AND THE BANK WAIVES TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF, THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS, OR ANY INSTRUMENT OR DOCUMENT DELIVERED PURSUANT TO THIS AGREEMENT, OR THE VALIDITY, PERFECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF BANK RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED.  EXCEPT AS PROHIBITED BY LAW, THE BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.   BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF BANK HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT BANK WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.  THIS WATER CONSTITUTES A MATERIAL INDUCEMENT FOR BANK TO ACCEPT ANY NOTE AND MAKE ANY LOAN PROVIDED FOR HEREIN.

(d)     The Bank may at any time pledge or assign all or any portion of its rights under the loan documents including any portion of the Notes or either of them to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341.  No such pledge or assignment or enforcement thereof shall release Bank from its obligations under any of the Loan Documents.

Section 9.14   Assignments and Participations by the Bank.

(a)     The Bank shall, at no expense to Borrower, have the unrestricted right at any time or from time to time, and without Borrower's or any Guarantor's consent, to assign all or any portion of its rights and obligations hereunder to one or more banks or other financial institutions (each, an "Assignee"), and Borrower and each Guarantor agree that it shall execute, or cause to be executed, such documents, including without limitation, amendments to this Agreement and to any other documents, instruments and agreements executed in connection herewith as Bank shall deem necessary to effect the foregoing.  In addition, at the request of Bank and any such Assignee, Borrower shall issue one or more new promissory notes, as applicable, to any such Assignee and, if Bank has retained any of its rights and obligations hereunder following such assignment, to Bank, which new promissory notes shall be issued in replacement of, but not in discharge of, the liability evidenced by the promissory note held by Bank prior to such assignment and shall reflect the amount of the respective commitments and loans held by such Assignee and Bank after giving effect to such assignment.  Upon the

execution and delivery of appropriate assignment documentation, amendments and any other documentation required by Bank in connection with such assignment, and the payment by Assignee of the purchase price agreed to by Bank, and such Assignee, such Assignee shall be a party to this Agreement and shall have all of the rights and obligations of Bank hereunder (and under any and all other guaranties, documents, instruments and agreements executed in connection herewith) to the extent that such rights and obligations have been assigned by Bank pursuant to the assignment documentation between Bank and such Assignee, and Bank shall be released from its obligations hereunder and thereunder to a corresponding extent.  Borrower may furnish any information concerning Borrower in its possession from time to time to prospective Assignees, provided that Bank shall require any such prospective Assignees to agree to maintain the confidentiality of such information in accordance with Section 9.16 hereof.

(b)     The Bank may sell participations to one or more banks or other entities (each a "Participant") in all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Commitment, the Loans and the Notes).  In the event of any such grant by Bank of a participating interest to a Participant, whether or not upon notice to Borrower, Bank shall remain responsible for the performance of its obligations hereunder and Borrower shall continue to deal solely and directly with Bank in connection with Bank's rights and obligations hereunder.

(c)     The Bank may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.14, disclose to the assignee or participant or proposed assignee or participant, any information relating to the Borrower furnished to the Bank by or on behalf of the Borrower, provided that Bank shall require any such Participant to maintain the confidentiality of such information in accordance with Section 9.16 hereof.

Section 9.15   Patriot Act Notice.

Bank hereby notifies the Borrower that, pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower and the other Loan Parties, which information includes the name and address of the Borrower and the other Loan Parties and other information that will allow Bank to identify the Borrower and the other Loan Parties in accordance with the Patriot Act.

Section 9.16   Confidentiality.

The Bank agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder, under any other Loan Document or under any other agreement or transaction between the Bank and the

Loan Parties or any action or proceeding relating to this Agreement, any other Loan Document or any other agreement or transaction between the Bank and the Loan Parties or the enforcement of rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (f) with the consent of the Borrower or (g) to the extent such Information (1) becomes publicly available other than as a result of a breach of this Section or (2) becomes available to the Bank or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.

For purposes of this Section, "Information" shall mean all information received from any Loan Party or any of its Subsidiaries relating to any Loan Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Bank on a nonconfidential basis from anyone other than a Loan Party prior to disclosure by any Loan Party or any of its Subsidiaries; provided that, in the case of information received from any Loan Party or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the date first above written.

**BOUCHARD TRANSPORTATION CO., INC.,**
a New York corporation

By _____

    Name:  Morton S. Bouchard, III
    Title:  President

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By_____

    Name: Edward P. Nallan, Jr.
    Title: Senior Vice President

EXHIBIT AND SCHEDULES TO
<u>LOAN AGREEMENT</u>

<u>EXHIBIT</u>

A      Form of Note

B      Form of Compliance Certificate

<u>SCHEDULES</u>

3.1      States of Incorporation and Qualification, and Capitalization and Ownership of Stock, of Borrower and Guarantors

3.2      Consents, Waivers, Approvals; Violation of Agreements

3.5      Vessels

3.6      Judgments, Actions, Proceedings

3.7      Defaults; Compliance with Laws, Regulations, Agreements

3.8      Burdensome Documents

3.11      Patents, Trademarks, Trade Names, Service Marks, Copyrights

3.13      Name Changes, Mergers, Acquisitions; Location of Collateral

3.16      Labor Disputes; Collective Bargaining Agreements; Employee Grievances

3.18      Employee Benefit Plans

4.3      Form of Pre-Closing Borrower's Certificate

7.1      Permitted Indebtedness and Guaranties

7.2      Permitted Security Interests, Liens and Encumbrances

EXHIBIT A

<u>NOTE</u>

$100,000,000.00                                                   New York, New York
                                                                October 30, 2013

FOR VALUE RECEIVED, the undersigned BOUCHARD TRANSPORTATION CO., INC., a New York corporation (the "Borrower"), hereby promises to pay to the order of WELLS FARGO BANK, NATIONAL ASSOCIATION (the "Bank") the principal sum of ONE HUNDRED MILLION DOLLARS ($100,000,000.00), payable on October 30, 2018, or such lesser amount as shall equal the full amount of the principal balance of this Note outstanding on such date, and to pay interest on the unpaid principal amount hereof at the rates per annum and for the periods set forth in or established by the Loan Agreement dated as of October 30, 2013 between the Borrower and the Bank (hereinafter, as it may from time to time be amended, modified or supplemented, referred to as the "Loan Agreement") and as calculated therein.  This is the Note referred to in the Loan Agreement.

All indebtedness outstanding under this Note shall bear interest (computed in the same manner as interest on this Note prior to the relevant due date) at the applicable Post-Default Rate (as such term is defined in the Loan Agreement) for all periods when such indebtedness, or any portion thereof, shall remain unpaid after the date on which such indebtedness was due, whether by acceleration or otherwise, and all of such interest shall be payable on demand.

The Bank shall maintain a record of each advance made by it to the Borrower under the Loan Agreement and of the amount of interest thereon from time to time becoming due.  Entries on such record made in good faith by the Bank shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to the Bank, provided, however, that the failure of the Bank to keep such a record or any finding that such record is incorrect shall not limit or otherwise affect the obligations of any Borrower under this Note or the Loan Agreement.

Anything herein to the contrary notwithstanding, the obligation of the Borrower to make payments of interest shall be subject to the limitation that payments of interest shall not be required to be made to the Bank to the extent that the Bank's receipt thereof would not be permissible under the law or laws applicable to the Bank limiting rates of interest which may be charged or collected by the Bank.  Any such payments of interest which are not made as a result of the limitation referred to in the preceding sentence shall be made by the Borrower to the Bank on the earliest interest payment date or dates on which the receipt thereof would be permissible under the laws applicable to the Bank limiting rates of interest which may be charged or collected by the Bank.

Payments of both principal and interest on this Note are to be made at the office of the Bank at 58 S. Service Road, Suite 100, Melville, NY  11747 or such other place as the holder hereof shall designate to the Borrower in writing, in lawful money of the United States of America in immediately available funds.  This Note is secured in the manner provided in the

66

Loan Agreement, is subject to prepayment upon the terms and conditions thereof and is entitled to the benefits thereof.

Upon the occurrence of any Event of Default, as defined in the Loan Agreement the principal amount of and accrued interest on this Note may be declared due and payable in the manner and with the effect provided in the Loan Agreement.

The Borrower shall pay costs and expenses of collection, including, without limitation, attorneys fees and disbursements in the event that any action, suit or proceeding is brought by the holder hereof to collect this Note.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS RULES PERTAINING TO CONFLICTS OF LAWS.

THE BORROWER IRREVOCABLY CONSENTS THAT ANY LEGAL ACTION OR, PROCEEDING AGAINST IT UNDER, ARISING OUT OF OR IN ANY MANNER RELATING TO THIS NOTE MAY BE BROUGHT IN ANY COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY JURISDICTION WHERE A VESSEL MAY BE FOUND. THE BORROWER, BY THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXPRESSLY AND IRREVOCABLY ASSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF ANY OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING. THE BORROWER FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF ANY COMPLAINT, SUMMONS, NOTICE OR OTHER PROCESS RELATING TO ANY SUCH ACTION OR PROCEEDING BY DELIVERY THEREOF TO IT BY HAND OR BY MAIL IN THE MANNER PROVIDED FOR IN SECTION 9.9 OF THE LOAN AGREEMENT. THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES ANY CLAIM OR DEFENSE IN ANY SUCH ACTION OR PROCEEDING BASED ON ANY ALLEGED LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS OR ANY SIMILAR BASIS. NOTHING IN THIS NOTE SHALL AFFECT OR IMPAIR IN ANY MANNER OR TO ANY EXTENT THE RIGHT OF THE BANK TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST SUCH BORROWER IN ANY JURISDICTION OR TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW.

THE BORROWER WAIVES TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF, THIS NOTE, OR THE VALIDITY, PERFECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF BANK RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREES THAT IT WILL NOTE SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, THE BORROWER HEREBY

WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.   THE BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF BANK HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT BANK WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WATER CONSTITUTES A MATERIAL INDUCEMENT FOR THE BANK TO ACCEPT THIS NOTE AND MAKE ANY LOAN PROVIDED FOR HEREIN.

BOUCHARD TRANSPORTATION CO., INC.

By:_____

      Title:

68

SCHEDULE 3.1
TO LOAN AGREEMENT

STATES OF INCORPORATION AND QUALIFICATION,
AND CAPITALIZATION AND OWNERSHIP
OF STOCK OF BORROWER AND GUARANTORS

The Borrower and each of the Guarantors are New York Corporations.

BOUCHARD TRANSPORTATION CO., INC. is owned 100% by trusts for the benefit of Morton S. Bouchard III or his family members.

BOUCHARD TRANSPORTATION CO., INC. in turn owns 100% of the shares of:

B. No. 210 Corp.
B. No. 215 Corp.
B. No. 225 Corp.
B. No. 245 Corporation
B. No. 250 Corp.
B. No. 260 Corporation
Tug Daniel M. Bouchard Corp.
Tug Brendon J. Bouchard Corp.
Tug Jane A. Bouchard Corp.
Tug Evening Star Corp.

Each grantor, each beneficiary and each trustee of each of the above-mentioned trusts is a citizen of the United States, as is each officer and director of each of the Borrower and Guarantors.  For the avoidance of any doubt, the only Persons who are guaranteeing the Obligations are those Persons defined as a "Guarantor" in the Agreement.  Without limiting the generality of the preceding sentence, no trust and no natural Person, including, without limitation, Morton S. Bouchard III, any member of the family of Morton S. Bouchard III or any trust controlled by any of them is a Guarantor.

SCHEDULE 3.2
TO LOAN AGREEMENT

CONSENTS, WAIVERS, APPROVALS;
VIOLATION OF AGREEMENTS

None.

SCHEDULE 3.5
TO LOAN AGREEMENT

VESSELS

| Vessel Name | Official Number | Owning Company | Agreed Value in the Event of Loss |
|---|---|---|---|
| B. No. 260 | 1210060 | B. No. 260 Corporation | $14,490,000 |
| B. No. 210 | 1037844 | B. No. 210 Corp. | $14,280,000 |
| B. No. 215 | 1064767 | B. No. 215 Corp. | $18,780,000 |
| B. No. 225 | 1139764 | B. No. 225 Corp. | $20,640,000 |
| B. No. 245 | 1050073 | B. No. 245 Corporation | $36,030,000 |
| B. No. 250 | 1235496 | B. No. 250 Corp. | $14,920,000 |
| Danielle M. Bouchard | 1053010 | Tug Danielle M. Bouchard Corp. | $18,510,000 |
| Brendan J. Bouchard | 1086926 | Tug Brendan J. Bouchard Corp. | $12,090,000 |
| Evening Star | 1234828 | Tug Evening Star Corp. | $12,090,000 |
| Jane A. Bouchard | 1139762 | Tug Jane A. Bouchard Corp. | $13,500,000 |
| | | **Total:** | **$175,330,000** |

Each Ship Mortgage covering the above listed Vessels should be filed with the National Vessel Documentation Center.

71

SCHEDULE 3.7
<u>TO LOAN AGREEMENT</u>

<u>DEFAULTS: COMPLIANCE WITH LAWS, REGULATIONS, AGREEMENTS</u>

None

SCHEDULE 3.8
TO LOAN AGREEMENT

BURDENSOME DOCUMENTS

None

SCHEDULE 3.11
<u>TO LOAN AGREEMENT</u>

PATENTS, TRADEMARKS, TRADE
<u>NAMES, SERVICE MARKS, COPYRIGHTS</u>

1.      <u>See</u> Schedule 3.5 for official name of each vessel.

2.      www.Bouchardtransport.com.

SCHEDULE 3.13
TO LOAN AGREEMENT

NAME CHANGES, MERGERS,
ACQUISITIONS LOCATION OF COLLATERAL

None except the following:

1.      Bouchard Coastwise Management Corp. was merged into Borrower by a Certificate of Merger dated December 1, 2009 and filed December 3, 2009.

2.      Bouchard Ocean Services, Inc. was merged into Borrower by a Certificate of Merger dated December 31, 2012.

SCHEDULE 3.16
TO LOAN AGREEMENT

LABOR DISPUTES, COLLECTIVE BARGAINING
AGREEMENTS: EMPLOYEE GRIEVANCES

None.

SCHEDULE 3.18
TO LOAN AGREEMENT

EMPLOYEE BENEFIT PLANS

BOUCHARD TRANSPORTATION CO., INC. EMPLOYEES RETIREMENT TRUST, effective December 31, 1973 (the "1973 Trust").

BOUCHARD TRANSPORTATION CO., INC. Vessel Employee's 401(k) Retirement Plan, effective December 31, 1997.*

*To be merged into the 1973 Trust on or about January 1, 2014.

SCHEDULE 4.3
TO LOAN AGREEMENT

FORM OF BORROWER'S CERTIFICATE

I, Morton S. Bouchard, III, hereby certify that:

1.    I am the President of Bouchard Transportation Co., Inc., a New York corporation and the "Borrower" under the terms of a Loan Agreement dated as of October 30, 2013 between such corporation and Wells Fargo Bank, National Association (the "Loan Agreement"). Capitalized terms used in this Borrowing Certificate not herein defined are used with the meanings given such terms in the Loan Agreement.

2.    This certificate is given the Bank in connection with a Loan being made on the date hereof.

3.    The proceeds of such Loan will be used for the purposes set forth in Section 2.13 of the Loan Agreement.

4.    No Default or Event of Default has occurred and is continuing under the Loan Agreement; and no such Default or Event of Default will exist after giving effect to such Loan.

5.    The representations and warranties contained in Article 3 of the Loan Agreement are true and correct on the date hereof, except for changes in the ordinary course of business none of which, either singly or in the aggregate, have had a Material Adverse Effect on the Borrower.

IN WITNESS WHEREOF I have hereunto set my hand this __ day of _____, ___.

 

                                          _____
                                          Morton S. Bouchard, III,
                                          President of the Borrower
                                          under the Loan Agreement above
                                          referred to.

SCHEDULE 7.1
TO LOAN AGREEMENT

PERMITTED INDEBTEDNESS AND GUARANTIES

None.

SCHEDULE 7.2
TO LOAN AGREEMENT

PERMITTED SECURITY INTERESTS,
LIENS AND ENCUMBRANCES

None.

EXHIBIT B
TO LOAN AGREEMENT

<u>FORM OF COMPLIANCE CERTIFICATE</u>

I, _____, hereby certify that:

1. I am the [President/Chief Financial Officer] of Bouchard Transportation Co., Inc., a New York corporation and the "Borrower" under the terms of a Loan Agreement dated as of October 30, 2013 between such corporation and Wells Fargo Bank, National Association (the "Loan Agreement"). Capitalized terms used in this Compliance Certificate not herein defined are used with the meanings given such terms in the Loan Agreement.

2. As of the date hereof no Default or Event of Default has occurred and is continuing under the Loan Agreement; and no such Default or Event of Default will exist after giving effect to [proposed action] nor would, upon consummation of [such proposed transaction] the covenants set forth in Section 6.9 of the Loan Agreement be breached. Annexed hereto is a calculation showing in detail that such [proposed transaction] would so comply with such covenants.

3. The representations and warranties contained in Article 3 of the Loan Agreement are true and correct on the date hereof, except for changes in the ordinary course of business none of which, either singly or in the aggregate, have had a Material Adverse Effect on the Borrower.

IN WITNESS WHEREOF I have hereunto set my hand this __ day of _____, ____.

_____
[President/Chief Financial Officer]
of the Borrower under the
Loan Agreement above referred to.

**EXHIBIT C**
**TO LOAN AGREEMENT**

**GUARANTY**

THIS GUARANTY, made as of the 30th day of October, 2013 jointly and severally by each of the undersigned, each a New York corporation, (each a "**Guarantor**" and collectively the "**Guarantors**"), in favor of WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association (the "**Bank**"),

**W I T N E S S E T H** :

**WHEREAS**:

A.     Bouchard Transportation Co., Inc., a New York corporation (the "Borrower"), has entered into an Loan Agreement dated as of October 30, 2013 (such agreement, including all exhibits and schedules thereto, as it may from time to time be amended, modified or supplemented, is hereinafter referred to as the "Loan Agreement") with the Bank, pursuant to which the Bank has agreed to make loans to the Borrower in the aggregate principal amount of One Hundred Million Dollars ($100,000,000), upon and subject to the terms and conditions of the Loan Agreement;

B.     Each Guarantor is a wholly-owned subsidiary of the Borrower and as such will derive benefits, both directly and indirectly, from the Borrower's receipt of the proceeds of the Loans to be made by the Bank pursuant to the Loan Agreement;

C.     It is a condition precedent to the obligation of the Bank to make the loans provided for in the Loan Agreement that each of the Guarantors execute and deliver this Guaranty; and

D.     All capitalized terms used herein that are defined in the Loan Agreement and that are not otherwise defined herein shall have the respective meanings ascribed to them therein unless the context otherwise requires;

**NOW**, **THEREFORE**, in order to induce the Bank to execute and deliver the Loan Agreement and to make the Loans contemplated thereunder, and in consideration of the benefits expected to accrue to the Guarantors by reason thereof, and for other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, each of the Guarantors hereby represents and warrants to, and covenants and agrees with the Bank, as follows:

1.     Each Guarantor hereby irrevocably and unconditionally guarantees to the Bank the punctual payment of the full amount, when due (whether by demand, acceleration or otherwise), of: (a) the principal of and interest on, and fees and expenses due pursuant to, the note issued by the Borrower pursuant to the Loan Agreement (hereinafter referred to, together with any and all amendments, modifications, substitutions and/or replacements thereof and thereto, as the "Note"), and (b) all other Indebtedness, liabilities and obligations of the Borrower to the Bank, whether under the Loan Agreement or otherwise created, whether now or hereafter

82

existing, and whether or not currently contemplated, due or to become due, direct or contingent, joint, several or independent, secured or unsecured and whether matured or unmatured (all of the Indebtedness, liabilities and obligations included in clauses (a) and (b) of this paragraph I are hereinafter referred to collectively as the "Guaranteed Obligations").  This is a guaranty of payment and not of collection, and is the primary obligation of each Guarantor, and the Bank may enforce this Guaranty in full at any time after the occurrence of any Event of Default (as defined in any of the Loan Agreement) against each of the Guarantors without any prior enforcement of the Guaranteed Obligations against the Borrower, any other guarantor (including any other Guarantor hereunder), or against any Collateral.

2.      All payments made by any Guarantor under or by virtue of this Guaranty shall be paid to the Bank at its office at 58 S. Service Road, Suite 100, Melville, NY  11747, or such other place as the Bank may hereafter designate in writing.  Each Guarantor hereby agrees to make all payments under or by virtue of this Guaranty to the Bank as aforesaid.  The Bank shall not be required otherwise to establish its authority to receive any payment made under or by virtue hereof.

3.      Each Guarantor hereby waives notice of acceptance of this Guaranty, notice of the creation, renewal or accrual of any of the Guaranteed Obligations and notice of any other liability to which this Guaranty may apply, and notice or proof of reliance by the Bank upon this Guaranty, and waives diligence, protest, notice of protest, presentment, demand of payment, notice of dishonor or nonpayment of any of the Guaranteed Obligations, suit or taking other action or making any demand against, and any other notice to the Borrower or any other party liable thereon.  During the existence of an Event of Default, the Bank may, at its election, foreclose on any security held by the Bank by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by applicable law), or exercise any other right or remedy the Bank may have against the Borrower or any other party, or any security, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Obligations have been indefeasibly paid in full in cash and the Commitment has been terminated.  Each Guarantor waives any defense arising out of any such election by the Bank, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantors against the Borrower or any other party or any security.

4.      So far as each Guarantor is concerned, the Bank may, at any time and from time to time, without the consent of, or notice to any Guarantor, and without impairing or releasing any of the obligations of any Guarantor hereunder, upon or without any terms or conditions and in whole or in part:

(a)      modify or change the manner, place or terms of, and/or change or extend the time of payment of, renew or alter, any of the Guaranteed Obligations, any security therefor any liability incurred directly or indirectly in respect thereto and this Guaranty shall apply to the Guaranteed Obligations as so modified, changed, extended, renewed or altered;

(b)      sell, exchange release; surrender, realize upon or otherwise deal with, in any manner and in any order, any property by whomsoever at any time pledged or mortgage to secure or howsoever securing the Guaranteed Obligations or any liabilities (including any of

these hereunder) incurred directly or indirectly in respect thereof or hereof and/or any offset or right with respect thereto;

(c)     exercise or refrain from exercising any rights against the Borrower or others (including, without limitation any other guarantor of payment of the Guaranteed Obligations) or otherwise act or refrain from acting and when making any demand hereunder against any Guarantor, the Bank may, but shall be under no obligation to, make a similar demand on any other guaranty of payment of the Guaranteed Obligations, and any failure by the Bank to make any such demand or to collect any payments from, or release of any other guarantor of payment of the Guaranteed Obligations shall not relieve any Guarantor of its obligations and liabilities hereunder, and shall, not release; impair or affect the rights and remedies, express or implied, or as a matter of law, of the Bank against the Guarantor (for the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings);

(d)     settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower to creditors of the Borrower other than the Bank and such Guarantor,

(e)     apply any sums by whomsoever paid or howsoever realized to any of the Guaranteed Obligations, regardless of what liability or liabilities of the Borrower remain unpaid; and

(f)     amend or otherwise modify any of the Loan Agreement, consent to or waive any breach of, or any act, omission or default or Event of Default under any of the Loan Agreement, any of the Notes, or any agreements, instruments or documents referred to therein or executed and delivered pursuant thereto or in connection therewith, and this Guaranty shall apply to the Guaranteed Obligations as set forth in each of such documents as so amended and modified.  Any such action, shall not impair or release any of the obligations of any Guarantor hereunder.

5.     No invalidity, irregularity or unenforceability of all or any part of the Guaranteed Obligations or of any security therefor shall affect, impair or be a defense to this Guaranty, and this Guaranty shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to the validity, regularity or enforceability of the Loan Agreement, the Notes or any of the other Guaranteed Obligations or any collateral security therefor or guaranty thereof or rights of offset with respect thereto at any time or from time to time held by the Bank and without regard to any defense, offset or counterclaim that may at any time be available to or be asserted by the Borrower against the Bank or that constitutes, or might be construed to constitute, a defense or equitable or legal discharge of the Borrower for the Guaranteed Obligations or any part thereof of any Guarantor under this Guaranty, in bankruptcy or in any other instance.

6.     Each Guarantor hereby acknowledges that the value of certain collateral security transferred, assigned and pledged to and with the Bank, as provided in the Loan Agreement will be adversely affected by any right of the Guarantor to be subrogated to the rights of the Bank

with respect to any indebtedness of the Borrower to the Bank.  Accordingly, until such time as the Guaranteed Obligations are paid in full, the Guarantor hereby irrevocably waives, for the benefit of the Bank, any and all rights that it presently has, or may hereafter have, whether by virtue of any payment or payments hereunder or otherwise, to be subrogated to the rights of the Bank against the Borrower with respect to any such indebtedness of the Borrower to the Bank.

7.     Each Guarantor agrees to be bound by, and to comply with all of the terms, covenants and provisions of each Loan Agreement to the extent that the same impose obligations in respect of or grant rights against it as a Guarantor or otherwise.

8.     Each Guarantor makes the following representations and warranties, which shall survive the execution and delivery of this Guaranty:

(a)     The Guarantor has examined the Loan Agreement, including the exhibits and schedules thereto, and all of the representations and warranties set forth in the Loan Agreement, to the extent the same relate to the Guarantor, are true and correct.

(b)     The Guarantor is a corporation, duly organized, validly existing and in good standing under the laws of the State of New York.  The Guarantor has all requisite power and authority, corporate or otherwise, to execute, deliver and perform this Guaranty, and has taken all necessary action, corporate or otherwise, to authorize the execution, delivery and performance of this Guaranty.  This Guaranty has been duly executed and delivered and constitutes the valid and legally binding obligation of the Guarantor, enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization or moratorium laws, now or hereafter in effect, relating to or affecting the enforcement of creditors' rights generally, and further subject to the discretion of the court in granting the remedy of specific performance and other equitable remedies.

(c)     No consent or approval of any Person (including, without limitation, stockholders of the Guarantor), no consent or approval of any landlord or mortgagee, no waiver of any Lien or right of distraint or other similar right and no consent, license, approval, authorization or declaration of, any Governmental Authority, bureau or agency, is or will be required in connection with the execution, delivery, performance, validity, enforcement or priority of this Guaranty, or any other agreements, instruments or documents to be executed or delivered pursuant hereto or thereto.

(d)     The execution and delivery of this Guaranty and any other agreements, instruments or documents to be executed and delivered hereunder, and performance herein and thereunder will not violate any provision of law, statute, rule or regulation to which the Guarantor is subject or conflict with or result in a breach of any judgment, decree, writ, injunction, ordinance, resolution, award, franchise, order, permit or other similar document or instrument of any court or Governmental Authority, bureau or agency, domestic or foreign, or the charter or by-law of the Guarantor, or create (with or without the giving of notice or lapse of time, or both) a default under any agreement, bond, note or indenture to which the Guarantor is a party or by which it is bound.

(e)     Each of the Guarantors hereby appoints the Borrower to act as its agent for all purposes under the Loan Documents and agrees that (i) the Borrower may execute such documents on behalf of such Guarantor as the Borrower deems appropriate in its sole discretion and each Guarantor shall be obligated by all of the terms of any such document executed on its behalf, (ii) any notice or communication delivered by the Bank shall be deemed delivered to each Guarantor and (iii) the Bank may accept, and be permitted to rely on, any document, instrument or agreement executed by the Borrower on behalf of each Guarantor.

9.     All notices, requests, demands or other communications hereunder shall be in writing either by letter (delivered by hand or commercial messenger service or sent by certified mail, return receipt requested) or telegram or telecopy, addressed as follows:

(a)     If to any Guarantor:

c/o Bouchard Transportation Co., Inc.
58 S. Service Drive
Suite 150
Melville, New York, 11747
Attention: Morton S. Bouchard, III President
Telecopier No.: (631) 390-4955

with a copy to:

Stephen I. Siller, Esq.
LeClairRyan, A Professional Corporation
885 Third Avenue — 16th Floor
New York, New York 10022
Telecopier No.: (212) 430-8065

(b)     If to the Bank:

Wells Fargo Bank, National Association
58 S. Service Road, Suite 100
Melville, NY  11747
Attention: Edward P. Nallan, Jr.
Telecopier No.: 516-577-8333

with a copy to:

King & Spalding LLP
100 N. Tryon St.
Charlotte, North Carolina
Attention: Justin Riess
Telecopier No.: (704) 503-2622

Any notice, request, demand or other communication hereunder shall be deemed to have been given on: (x) the day on which it is telecopied to such party at its telecopier number specified above (provided such notice shall be effective only if followed by one of the other methods of

delivery set forth herein) or delivered by receipted hand or such commercial messenger service to such party at its address specified above, or (y) on the third Business Day after the day deposited in the mail, postage prepaid, if sent by mail, or (z) on the day it is delivered to the telegraph company, addressed as aforesaid, if sent by telegraph.  The Bank or the Guarantor may change the Person, address or telecopier number to whom or which notices are to be given hereunder, by notice duly given hereunder; provided, however, that any such notice shall be deemed to have been given hereunder only when actually received by the party to which it is addressed.

10.     No delay on the part of the Bank in exercising any of its options, powers or rights, and no partial or single exercise thereof, whether arising hereunder, under any of the Loan Agreement, any of the Notes, or otherwise, shall constitute a waiver thereof or affect any right hereunder.  No waiver of any of such rights and no modification, amendment or discharge of this Guaranty shall be effected unless executed and delivered in accordance with the provisions of the Loan Agreement and then such waiver shall apply only with respect to the specific instance involved and shall in no way impair the rights of the Bank or the obligations of the Guarantor to the Bank in any other respect at any other time.

11.     **THIS GUARANTY AND THE RIGHTS AND OBLIGATIONS OF THE BANK AND THE GUARANTORS HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS RULES PERTAINING TO CONFLICTS OF LAWS.  EACH GUARANTOR WAIVES TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS GUARANTY.  IN THE EVENT THE BANK BRINGS ANY ACTION OR SUIT IN ANY COURT OF RECORD IN THE STATE OF NEW YORK TO ENFORCE ANY OR ALL LIABILITIES OF ANY GUARANTOR HEREUNDER, SERVICE OF PROCESS MAY BE MADE UPON ANY GUARANTOR BY MAILING A COPY OF THE SUMMONS TO THE GUARANTOR BY CERTIFIED OR REGISTERED MAIL, AT THE ADDRESS SPECIFIED IN PARAGRAPH 9 HEREOF, AND EACH GUARANTOR HEREBY CONSENTS TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK, COUNTY OF NEW YORK, AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OVER THE PERSON OF SUCH GUARANTOR AND HEREBY WAIVES ANY CLAIM OR DEFENSE IN ANY SUCH ACTION OR PROCEEDING BASED ON ANY ALLEGED LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, OR THAT NEW YORK COUNTY OR THE SOUTHERN DISTRICT OF NEW YORK IS AN INCONVENIENT FORUM.  EACH GUARANTOR HEREBY WAIVES THE RIGHT TO INTERPOSE COUNTERCLAIMS OR SET-OFFS OF ANY KIND AND DESCRIPTION IN ANY SUCH ACTION OR SUIT ARISING HEREUNDER OR IN CONNECTION HEREWITH UNLESS SUCH COUNTERCLAIM OR SET-OFF WOULD, UNDER APPLICABLE LAW, BE PERMANENTLY AND IRREVOCABLY LOST IF NOT ASSERTED IN SUCH ACTION OR SUIT.  EACH GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVERS CONSTITUTE A MATERIAL INDUCEMENT FOR THE BANK TO ACCEPT THIS GUARANTY**.

12.     If claim is ever made upon the Bank for repayment or recovery of any amount or amounts received by it in payment or on account of any of the Guaranteed Obligations and it repays all or part of such amount by reason of any: (a) judgment, decree or order of any court or administrative body having jurisdiction over it or any of its property, or (b) settlement or compromise of any such claim effected by it with any such claimant (including the Borrower), then, and in either such event, each Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon such Guarantor, notwithstanding the cancellation of any instrument evidencing any of the Guaranteed Obligations, and each Guarantor shall be and remain liable hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Bank.

13.     This Guaranty shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the Bank and its successors and assigns; provided however, that no Guarantor shall be entitled to assign or delegate any of its rights or obligations under this Guaranty without the prior written consent of the Bank, and any purported assignment in the absence of such consent shall be void.  This Guaranty embodies the entire agreement and understanding between the Bank and the Guarantors relating to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof.

14.     (a)     The provisions of this Guaranty are severable.  If any clause or provision

shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision in this Guaranty in any jurisdiction.

(b)     If any other guaranty by any one or more other guarantors of the Guaranteed Obligations is held or determined to be void, invalid or unenforceable, in whole or in part, such holding or determination shall not impair or affect the validity and enforceability of:

(i)     the guaranty hereunder by each Guarantor, which shall continue in full force and effect in accordance with its terms; or

(ii)     any clause or provision not so held to be void, invalid or unenforceable.

(c)     This Guaranty is the joint and several obligation of each of the Guarantors hereunder and shall be construed as if each Guarantor has separately obligated itself pursuant to the terms hereof without reference to the obligations of any other Guarantor.

[Remainder of this page intentionally left blank]

**IN WITNESS WHEREOF**, the undersigned have each caused this Guaranty to be duly executed and delivered as of the day and year first above written.

> B. NO. 210 Corp.;
> B. NO. 215 Corp.;
> B. NO. 225 Corp.;
> B. NO. 245 Corporation;
> B. NO. 250 Corp.;
> B. NO. 260 Corporation;
> Tug Brendan J. Bouchard Corp.;
> Tug Danielle M. Bouchard Corp.;
> Tug Jane A. Bouchard Corp.
> Tug Evening Star Corp.
>
>
> By: _____
>     Title: President of, and on behalf of,
>     each of the above-named corporations.

89

**EXHIBIT D**
**TO LOAN AGREEMENT**

**[FORM OF]**
**SOLVENCY CERTIFICATE**

TO:          Wells Fargo Bank, National Association

RE:          Loan Agreement, dated as of October 30, 2013, by and among BOUCHARD TRANSPORTATION CO., INC., a New York corporation ("Borrower") and Wells Fargo Bank, National Association, as Bank (as amended, modified, extended, restated, replaced, or supplemented from time to time, the "Loan Agreement"; capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Loan Agreement)

DATE:       October 30, 2013

---

The undersigned president or chief financial officer of the Borrower is familiar with the properties, businesses, assets and liabilities of the Loan Parties and is duly authorized to execute this certificate on behalf of the Borrower and the Loan Parties.

The undersigned certifies that he/she has made such investigation and inquiries as to the financial condition of the Loan Parties as the undersigned deems necessary and prudent for the purpose of providing this Certificate.  The undersigned acknowledges that the Bank is relying on the truth and accuracy of this Certificate in connection with the making of Loans under the Loan Agreement.

The undersigned certifies that the financial information, projections and assumptions which underlie and form the basis for the representations made in this Certificate were reasonable when made and were made in good faith and continue to be reasonable as of the date hereof.

BASED ON THE FOREGOING, the undersigned certifies that, both before and after giving effect to the transactions contemplated by the Loan Agreement and other Loan Documents:

      (a)     Each of the Loan Parties is solvent and is able to pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business.

      (b)     The fair saleable value of each Loan Party's assets, measured on a going concern basis, exceeds all probable liabilities, including those to be incurred pursuant to the Loan Agreement.

(c)     None of the Loan Parties has unreasonably small capital in relation to the business in which it is or proposed to be engaged.

(d)     None of the Loan Parties has incurred, or believes that it will incur debts beyond its ability to pay such debts as they become due.

(e)     In executing the Loan Documents and consummating the Transactions, none of the Loan Parties intends to hinder, delay or defraud either present or future creditors or other Persons to which one or more of the Loan Parties is or will become indebted.

This Certificate may, upon execution, be delivered by facsimile or electronic mail, which shall be deemed for all purposes to be an original signature.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

BOUCHARD TRANSPORTATION CO., INC.

By_____
    Title: